Gary BURRIS, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 49S00–8610–PC–917.

Supreme Court of Indiana.

Aug. 24, 1990.

Rehearing Denied Oct. 23, 1990.

Linda Wagoner, Fort Wayne, Ind., for appellant.

Linley E. Pearson, Atty. Gen., Joseph N. Stevenson, Deputy Atty. Gen., Indianapolis, Ind., for appellee.

SHEPARD, Chief Justice.

Gary Burris was convicted of murder under Ind.Code § 35–42–1–1 (Burns 1979 Repl.). On December 5, 1980, the jury recommended Burris be sentenced to death and Judge John Tranberg followed their recommendation. This Court affirmed the sentence on direct appeal. *Burris v. State* (1984), Ind., 465 N.E.2d 171, *cert. denied*, 469 U.S. 1132, 105 S.Ct. 816, 83 L.Ed.2d 809 (1985). Judge Roy Jones, acting as special judge, denied Burris' petition for post-conviction relief. We have regrouped and restated the issues Burris raises on appeal:

I. Whether the jury at Burris' trial was improperly conditioned under the rule put forth in *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

II. Whether Burris was denied effective assistance of counsel.

III. Whether Burris was convicted of a crime greater than the one defined in the instructions to the jury.

Our standard for reviewing the denial of a post-conviction petition does not allow us to weigh the evidence or judge the credibility of the witnesses. It requires the petitioner to establish that the evidence as a whole leads unmistakably to a decision in his favor. *Schiro v. State* (1985), Ind., 479 N.E.2d 556, *cert. denied*, 475 U.S. 1036, 106 S.Ct. 1247, 89 L.Ed.2d 355 (1986).

We conclude that Burris did not receive effective assistance of counsel during the sentencing phase of his trial and we reverse the sentence of death. Otherwise, we affirm the denial of his post-conviction petition.

## I. *Jury Conditioning*

Burris argues that his conviction is unsound because during voir dire the jury was repeatedly told that they would only recommend the death sentence to the judge and that the judge would make the final decision. For example, the prosecutor asked if a juror understood that "the ultimate decision rests in Judge Tranberg and not in anybody else." Trial Record at 697. Burris asserts that ten members of the jury heard 34 remarks of that kind, while two members of the jury heard such remarks four times. He calls it conditioning. Brief for Defendant at 37.

Burris contends that this jury conditioning violates his sixth, eighth and fourteenth amendment rights. He claims it is unconstitutional to allow the jury to believe the responsibility for sentencing the defendant to death lies elsewhere, citing *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). Burris reminds us that his direct appeal was decided before *Caldwell* and did not consider whether conditioning made it less likely the jury would recommend life.

The State claims that the statements during voir dire accurately reflected the jury's advisory role. The State also argues that *Caldwell* only applies if the *sentencer* has been led to believe that the responsibility for determining the appropriateness of defendant's death lies elsewhere. Thus the State would have us conclude that because an Indiana jury is not the sentencer, most of the responsibility does lie elsewhere.

In *Caldwell v. Mississippi* the U.S. Supreme Court held that a capital sentence is not valid "when the sentencing jury is led to believe that responsibility for determining the appropriateness of a death sentence rests not with the jury but with the appellate court which later reviews the case." 472 U.S. at 323, 105 S.Ct. at 2636. This holding was based on the idea that "state-induced suggestions that the sentencing jury may shift its sense of responsibility to an appellate court" risk creating "substantial unreliability as well as bias in favor of death sentences." 472 U.S. at 330, 105 S.Ct. at 2640. The *Caldwell* Court stated

that because it could not conclude that the State's effort to minimize the jury's sense of responsibility had no effect on the sentencing decision, the jury's decision did not meet the standard of reliability required by the eighth amendment. 472 U.S. at 341, 105 S.Ct. at 2646.

In assessing the applicability of *Caldwell* to Indiana's sentencing scheme, we are aided by decisions applying *Caldwell* to Florida's similar system. The Eleventh Circuit reviewed the applicability of *Caldwell* to Florida's sentencing scheme in *Adams v. Wainwright*, 804 F.2d 1526 (11th Cir.1986), *rev'd*, 489 U.S. 401, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989). There, the trial judge told prospective jurors:

> The ultimate responsibility for what this man gets is not on your shoulders. It's on my shoulders. You are merely an advisory group to me.... So that this conscience part of it as to whether or not you're going to put the man to death or not, that is not your decision to make. That's only my decision to make and it has to be on my conscience. It cannot be on yours.

*Id.* at 1528. The district court had concluded that Adams' claim did not " 'derive any merit from the *Caldwell* decision' because the trial judge and not the jury, is the sole sentencer in Florida." 804 F.2d at 1528–29. Despite the state's claim that prejudice could not be demonstrated because the comments were a correct assessment of Florida law, the Court of Appeals found that the judge's comments "were misleading because they left the jury with a false impression as to the significance of their role in the sentencing process." 804 F.2d at 1531, n. 7.

The U.S. Supreme Court reversed the Eleventh Circuit's decision. It noted that Adam's first appeal preceded the *Caldwell* decision, but declared that *Caldwell* merely recognized that an instruction invalid under state law because it mischaracterizes the jury's role violates the eighth amendment. The state law violation is the basis for the eighth amendment violation. As Justice White wrote for the Court, "if the challenged instruction accurately described the

role of the jury under state law, there is no basis for a Caldwell claim." 489 U.S. at ——, 109 S.Ct. at 1215, 103 L.Ed.2d at 443.

Noting that instructions must be invalid under state law to sustain a *Caldwell* claim, the Court determined that Adams had waived his right to present a federal claim by failing to challenge the validity of the judge's instructions during the state court proceedings. The fact that the trial court remarks were objectionable on federal as well as state grounds did not excuse Adams' failure to follow the state's procedural rules. *Dugger v. Adams*, 489 U.S. 401, ——, ——–——, 109 S.Ct. 1211, 1213–14, 1215–17, 103 L.Ed.2d 435, 441, 443–45 (1989).

■ Under *Dugger v. Adams* the fact that Burris' first appeal predated the *Caldwell* opinion does not negate the State's interest in timely objections to invalid instructions, nor does it excuse his failure to argue this issue under state law in his direct appeal. Because the State responded to this issue on the merits, however, without asserting waiver, we will address it on the merits.

■ The differences between the statements made at Burris' trial and those held improper in *Caldwell* are telling. The jurors in *Caldwell* were told that the alternative decisionmaker was the state supreme court, that the death penalty law required automatic review. There was no mention of the possibility of review following a sentence of years. In some respects it was a suggestion that the way to assure review was to impose death. The implication was that the Mississippi Supreme Court was the final decisionmaker. In fact, the jury was the decisionmaker.

By contrast, the jury in Burris' trial was simply informed that the responsibility for sentencing rests with the judge. In Indiana, as under the Florida system reviewed in *Dugger*, the judge is the decisionmaker.

This Court has said: "An Indiana trial court need not accept the jury's recommendation either for or against the death penalty. The capital sentencing statute pro-

vides, 'The court is not bound by the jury's recommendation.' Ind.Code § 35–50–2–9 (Burns 1985 Repl.)" *Martinez Chavez v. State* (1989), Ind., 534 N.E.2d 731, 733.

The Indiana death penalty statute states in part:

> If the defendant was convicted of murder in a jury trial, the jury shall reconvene for the sentencing hearing; if the trial was to the court, or the judgment was entered on a guilty plea, the court alone shall conduct the sentencing hearing. The jury or the court may consider all the evidence introduced at the trial stage of the proceedings, together with new evidence presented at the sentencing hearing.

Ind.Code § 35–50–2–9(d) (Burns 1985 Repl.).[1] The statute further instructs:

> If the hearing is by jury, the jury shall recommend to the court whether the death penalty should be imposed.... The court shall make the final determination of the sentence, after considering the jury's recommendation, and the sentence shall be based on the same standards that the jury was required to consider. The court is not bound by the jury's recommendation.

Ind.Code § 35–50–2–9(e) (Burns 1985 Repl.).

Not only did the prosecutor's comments accurately reflect Indiana law, we are satisfied that the jury was not misled concerning the importance of their recommendation. The statements about which Burris complains must also be considered in context of the lengthy and detailed voir dire to select the jury in Burris' case. During the voir dire the jurors were informed that their decision was a recommendation and that it would receive great weight. The prosecutor told the jury: "Judge Tranberg, sitting up there, representing this Criminal Court, is the person with the ultimate responsibility for imposing a sentence; all that this jury would do would be to make a recommendation, do you understand that?" Record at 518. Judge Tranberg, on the other hand, was careful to tell the jurors

their recommendation was important, stating:

> Before we go on here, I just want to say one thing. While it is a recommendation to the Court, if you get to the sentencing hearing, do not take your duty lightly as to what your recommendation is. It's a very solemn thing, because, after all, you would determine whether or not, if there is a sentencing hearing, the aggravating circumstance outweighs any mitigating circumstances. And the weight to be given to a jury comprised of citizens from this community, the weight of that decision or recommendation, you can imagine, would weigh very heavily with the Court. So it's not a recommendation that you say, well, we'll let the Judge decide, because it is a very heavy responsibility and not to be taken lightly. I just want to make sure the recommendation part is understood.

Record at 539–40. All of the prosecutor's comments about the jury's role of recommending constituted a small part of a voir dire which runs hundreds of pages. Record at 476 to 755. Their total effect did not have the same impact as does the defendant's description of these comments separated from the entire voir dire.

The prosecutor did not misrepresent the law or improperly condition the jury. Given the court's admonishment regarding the weight the jury's recommendation would have, the evidence does not lead unerringly to the conclusion that the jury had a false impression as to the significance of their role. The post-conviction court properly denied relief on these grounds.

## II. *Ineffective Assistance of Counsel*

Burris claims that both his trial counsel and his appellate counsel were ineffective. He alleges Tom Alsip and Craig Turner, his trial attorneys, were ineffective during the guilt phase of his trial because they failed to object to prosecutorial misconduct and to erroneous instructions. He also claims his trial attorneys were ineffective during the penalty phase of his trial because they failed to develop and present evidence of

---

1. The death penalty statute has been amended since Burris was sentenced, but those changes do not affect the provisions of the statute cited in this opinion.

mitigation. Burris argues his appellate counsel, James Holland, was ineffective for omitting the issue of failure to present mitigating evidence from his brief on direct appeal.

 The U.S. Supreme Court set forth the Sixth Amendment standard for effective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To succeed on an ineffective assistance of counsel claim, Burris must show that his attorneys' performance fell below an objective standard of reasonableness under prevailing professional norms and that his attorneys' failure to function was so prejudicial as to deprive him of a fair trial. A fair trial is denied under this federal standard when the conviction or sentence results from a breakdown of the adversarial process that renders the result unreliable. *Siglar v. State* (1989), Ind., 541 N.E.2d 944. To meet his burden of proof, Burris must offer strong and convincing evidence to overcome the presumption that counsel prepared and executed an effective defense. *Williams v. State* (1987), Ind., 508 N.E.2d 1264.

*A. Ineffectiveness at the Guilt Phase.* Burris argues that his trial counsel failed to object to improper conditioning and did nothing to dispel the impression that the jury's decision was a mere recommendation. Our resolution of the *Caldwell* issue discussed above indicates that objections to the statements on the jury's role would have been unavailing.

 Burris argues that trial counsel failed to object to prosecutorial misconduct and to prejudicial statements in the prosecutor's closing argument, precluding review on direct appeal. The misconduct Burris identifies includes reference to personal opinion, use of position, reference to the plight of the victim, appeal to patriotism, implication that the system coddles

defendants, and a request that the jury to send a message to the public. He claims that a death-qualified jury is particularly receptive to a prosecutor's crime control arguments and emotional, patriotic urgings and that substantial mitigating evidence is required to overcome such a jury's receptiveness to these prosecutorial tactics. Our review of the record indicates that the prosecutor's closing argument did not put Burris in grave peril, and therefore the defense counsel's failure to object does not establish ineffectiveness. *See generally Siglar v. State*, 541 N.E.2d at 948.

 Burris argues that one of his trial counsel, Tom Alsip, violated disciplinary rules that dictate a lawyer shall not intentionally prejudice or damage his client. To support his argument, Burris points out that Alsip caused a key witness to testify that Alsip was a bad attorney. Burris also notes that Alsip told the jury about his own arrest. The State responds that in context these self-depreciating comments represent justifiable tactical decisions. The State proposes that Alsip's effort to have a witness admit that he had disliked having Alsip as an attorney because he was not a very good lawyer was designed to portray that witness as an opportunist whose testimony was not reliable. Alsip's talk of his own arrest was an attempt to humanize Burris by showing the possibility of rehabilitation. We do not second guess tactics of trial counsel unless they are proven to be prejudicial. We agree with the State that there are conceivable tactical explanations for making these statements.

 Burris' attorneys said their strategy was to try to humanize their client.[2] Their behavior at trial, however, contradicted that objective. In his closing argument at the guilt phase Alsip made statements revealing his distaste for Burris: "Now then, this is a street people case.

---

**2.** Alsip testified at the post-conviction hearing that his primary objective at the penalty phase was to humanize his client and to convince the jury not to recommend death. PCR at 341. While Alsip did not recall what was done in this particular case, in theory he would put people on the stand to say anything good they could about him. PCR at 342. He acknowledged that

he did not review the pre-sentence report for prior offenses. Alsip did not investigate Burris' welfare records either, so he did not know that Burris had been raised by a man named Richard Jewell Newland or that Burris had become a ward of the state when Newland was incarcerated for a manslaughter conviction. PCR at 349.

We've got a street person defendant. We have almost exclusively street people witnesses." Record at 1152. Later in the summation he said: "He's not the best, best one I've ever had, Burris isn't. I don't even like him. He and I have had several arguments. But I'm saying he is entitled ... to everything that anybody else is. By God, I'm going to see to it that he gets it." Record at 1154. Alsip's summation seemed to convey that it would be personally inconvenient if the jury found his client guilty:

> Now, there are several things you can do. You can find him guilty of murder. And then we all get to come back, don't we, for that other hearing that we talked about earlier. So you can do that. Ruin my afternoon, possibly even all day tomorrow, I don't know. That's one of your possibilities. The other possibility you have ... would be to find him guilty of something other than that.... And I don't have to tell you that you don't have to be geniuses to figure out that you can do that.

Record at 1155–56.

These comments are reprehensible. Burris' trial attorneys portrayed him in an unsympathetic light. The strength of the evidence against Burris[3] indicates he would have been convicted of murder even in the absence of these comments, so we do not believe this characterization prejudiced the jury's decision regarding Burris' guilt.

This portrayal of Burris was, however, likely to linger in the jurors' minds and prejudice their decision concerning the death penalty.

*B. Ineffectiveness at the Penalty Phase.* Burris claims he was deprived of his right to meaningful representation because his trial attorneys failed to develop and present mitigating evidence and undermined what mitigating evidence they did present. He claims that their deficient performance and failure to present any favorable evidence adversely affected the outcome. Burris argues that the post-conviction court must have erred in finding that mitigating evidence was presented at trial,[4] since the trial court stated in its findings that there was no evidence of mitigation.[5] Burris contends that either the mitigating evidence presented at his post-conviction hearing is new evidence, or his trial attorneys were ineffective for failing to discover and present this evidence.

■■■ The State argues this issue has been waived by failure to present it on direct appeal; Burris' appellate brief addressed failure to present mitigating evidence in its facts section but not in its argument. Burris alleges his appellate counsel was ineffective for omitting the issue of failure to present mitigating evidence. James Holland, Burris' counsel on direct appeal, testified that he recognized

---

3. The victim was a Northside Cab Company driver. Prior to his last cab run Thelma Williams called the cab company on Burris' request. Later that night a witness saw Burris destroy a cab driver's run sheet. The police found the victim's cab outside the apartment where Burris was staying and found the murder weapon inside the same apartment.

4. In his findings of fact Judge Roy Jones wrote: "14. Petitioners trial attorneys made a strategic decision to attempt to save Petitioner from the death penalty by presenting mitigating evidence on intoxication at the sentencing to the trial judge." In his conclusion of law Judge Jones wrote: "5. Petitioner's trial attorneys' decision to attempt to save Petitioner from imposition of the death penalty by the presentation of mitigating evidence of intoxication to the trial judge was a strategic decision that does not show by a preponderance of the evidence that his attorneys rendered ineffective assistance by performing

outside the range of competence demanded of defense attorneys in criminal cases.

6. Any newly discovered evidence that might be available upon re-trial of this cause as to mitigating circumstances would not be likely to produce a different result on re-trial as far as sentencing is concerned. *Emmerson [Emerson] v. State* (Ind.1972) [259 Ind. 399] 287 N.E.2d 867."

5. The trial court's findings included the following:

"Number Three, that there is no showing that the Defendant's capacity to appreciate the criminality of his conduct, or conform his conduct to the requirements of law, was substantially impaired as the result of any intoxication. I have also not found any other mitigating factors that have been presented to this Court. That is the next finding, there are no other mitigating factors that have been presented to this Court." Record at 1307–08.

the issue of ineffective assistance of counsel and intended to argue it, but while he included it in the facts section of the brief, he inadvertently omitted it from his argument. We accept Burris' argument that he was denied a fair appeal as a result of this omission and look to the merits of this issue.

As for the merits, the State asserts that character references which date back to Burris' childhood may have been ineffective to counter the callousness of Burris' criminal acts. Furthermore, the State argues that Burris' attorneys could have made a tactical decision not to use all available evidence to avoid opening the door to Burris' prior criminal record.

■ In light of the maligning comments made at the summation of the guilt phase, we find the penalty phase of Burris' trial was conducted in a manner that entitles him to relief under the *Strickland* test. The performance of Burris' trial attorneys fell below reasonable professional standards and their performance did prejudice the penalty phase of Burris' trial.

First, Burris' trial attorneys were inconsistent in their presentation of mitigating evidence of intoxication. The sole mitigating evidence they presented to the jury at the penalty phase of the trial was Carol Wilkins' testimony that she saw Burris take one sip of gin the night of the murder. Yet in the closing argument at the penalty phase Mr. Alsip made the following comments:

> Well, I don't think Gary Burris is cuckoo. Or he was drunk. Maybe he was drunk, I don't know.... if you find that he was intoxicated, that's the mitigating circumstance that you have to balance against the aggravating circumstances. That's not the one I'm going to talk to you about. It may be present. There is evidence of it. If you choose to believe that, then don't recommend the death penalty to Judge Tranberg. It may be present. Maybe it is present, I don't know. Those people drink all the time.

It's a way of life. It's a lifestyle. Some people are quite intoxicated and don't show it. Others are not too intoxicated and you think they are. I don't know.

Record at 1233. He concluded his closing arguments with "if you take this man's life in this situation, even an insignificant, snively little street person like he is, we're all diminished by it, we're all hurt by it." Record at 1240.

Second, the record establishes failure to investigate mitigation. At the post-conviction hearing, neither of Burris' trial attorneys remembered who was lead counsel in the case,[6] and they acknowledged that they did not conduct an investigation or review Burris' records prior to the penalty phase. They stated that they waited until after they received the pre-sentence report to request an investigator, because prior to that they had no information indicating an investigation would be useful. PCR at 237–39. However, Burris contends the same information appeared in pre-sentence reports from his earlier convictions. Mr. Holland, Burris' appellate attorney, testified at the PCR hearing that inasmuch as probation officers were able to discover the information about Burris which they included in the pre-sentence report, Burris' attorneys should have been able to find even more information.

Andrea Lyons testified as an expert on death penalty preparation. She discussed the prevailing professional norms, concluded that Burris' representation fell below reasonable standards, and offered her belief that there is a reasonable probability a jury informed of mitigating evidence would have recommended against death.

Craig Turner, one of Burris' two trial attorneys, testified that it was unfortunate that they did not discover the need for an investigator sooner because "it may have had some effect on the jury recommendation." PCR at 240. Burris argues that failure to present mitigating evidence was the result of inadequate investigation and must be distinguished from making a stra-

---

6. At the post-conviction hearing, Craig Turner testified that Tom Alsip was lead counsel and assigned him specific tasks. PCR at 232. Mr. Alsip testified that it was Craig Turner's case and Judge Tranberg appointed him to assist Mr. Turner. PCR at 340.

tegic decision to present no mitigating evidence.

The U.S. Supreme Court has held that an attorney who makes a reasonable decision not to present evidence that his client had an exceptionally unhappy and unstable childhood after some investigation of the client's background, complies with the dictates of *Strickland. Burger v. Kemp*, 483 U.S. 776, 794–95, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638, 657 (1987). In that case the attorney was aware of some but not all of his client's family history. He had talked with his client's mother a number of times, interviewed another attorney who was a friend of the defendant and his mother, and a psychologist whom he hired to examine his client. Based on these interviews, the Supreme Court determined that the attorney had "made a reasonable decision that his client's interest would not be served by presenting this type of evidence." 483 U.S. at 790–91, 107 S.Ct. at 3124, 97 L.Ed.2d at 655.

Subsequently the Seventh Circuit concluded that the holding in *Burger v. Kemp* did not compel a finding of adequate assistance where the failure to investigate or present mitigating evidence was coupled with the making of a bizarre and prejudicial closing argument. *Kubat v. Thieret*, 867 F.2d 351 (7th Cir.1989).

> Given this grossly substandard argument and the fact that defense counsel presented no other evidence—despite the availability of fifteen character witnesses —Kubat's representation at sentencing amounted to no representation at all. No effort was made to present Kubat to the jury as a human being. Clearly, this total absence of advocacy falls outside *Strickland's* "wide range of professionally competent assistance."

867 F.2d at 368. We conclude that trial counsel's failure in this case to investigate fell below prevailing norms in the profession.

Third, evidence presented at Burris' post-conviction hearing indicates that substantial mitigation was available. That evidence included Burris' juvenile court records which show that Burris had been abandoned by his parents. Burris was raised by the Newlands, proprietors of the M & J Social Club. Mr. Newland's court records establish that he was charged with procuring a female for a house of prostitution and pandering in January 1965 and that he was convicted of manslaughter and incarcerated in December 1965. PCR at 212, 214.

Juanita Cooper testified that she had worked at the M & J Social Club where Burris lived in a room next to the pool room. She said Burris had the task of knocking on the prostitutes' doors to let them know their time was up. Her opinion of Burris was that he was a nice boy who got involved with the wrong people. Gwen Reynolds, a cook at the M & J, also described Burris' childhood. She said he was not allowed to go to school until he completed his chores, which included buying groceries for the M & J. She testified that when she was there he was a very good boy and that under different circumstances he would have been a better child. PCR at 318–327.

In August 1969 at the age of 12 Burris was declared neglected by the juvenile court and made a ward of the county. PCR at 200. Delma Edmondson was Burris' foster mother from August 1969 until February 1975. PCR at 217. She testified at the post-conviction hearing that Burris did his chores and got along well with the other children. She said he never asked for toys at Christmas; instead, every year he would ask for a copy of his birth certificate because he wanted to know who he was. Burris' caseworker did not have his birth record, so Burris was instructed to choose his own birthdate. PCR at 189. Edmondson testified that out of 100 children that she had been a foster parent to, Burris was one of 4 or 5 who continue to send her birthday cards and to call her to say how he is doing. She offered her opinion that Burris is a good boy who made a bad mistake. PCR at 185–192.

Dr. Stewart, a clinical psychologist, also testified at the PCR hearing. He stated that Burris' background made it more likely that he would be violent, that Burris

could function well in a controlled environment like prison, that Burris did not have anti-social behavior patterns, and that he does have socially redeeming values.

Burris' PCR attorney also submitted Burris' GED as an example of an achievement that could have been used in mitigation.

Burris' post-conviction attorneys have developed mitigating evidence that might have an effect on a jury. This mitigating evidence presents a considerably different picture of Burris than the one the jury might have inferred in its absence. In the absence of information about Burris' past, testimony by witnesses may have fostered the impression that Burris came from a relatively normal nuclear family. At trial Thelma Williams, bar maid at the M & J social club, testified that she did not know Burris' last name until she asked his mother.[7] Later in the trial William Kirby testified that he knew the defendant's father.[8] That testimony was not contradicted despite the fact that substantial evidence indicates Burris never knew who his parents were.

A good deal of the evidence presented at the post-conviction hearing would have helped create a more sympathetic portrait of Burris. On the other hand, some of the evidence submitted was damaging. Jerry Metheney testified that he had been a manager at Bonanza and that he had been Burris' supervisor from November 1974 to March 1975. Metheney remembered Burris as a cooperative employee. He testified that Burris was number one cook, did a good job of training other employees and remained calm under pressure. On cross-examination the prosecutor asked Metheney if he knew that Burris had committed armed robberies of Bonanza restaurants.

Metheney had not known about the robberies and expressed concern that his testimony may have sounded stupid in light of those facts. Record at 300–10. Despite the negative effect this evidence might have had on the finder of fact, we must ask if the cumulative effect of counsel's acts and omissions rendered the result of the penalty phase unreliable.

This Court recently held an attorney's failure to prepare evidence in mitigation for the penalty phase of a capital case constituted ineffective assistance of counsel undermining our confidence in the death sentence. *Smith v. State* (1989), Ind., 547 N.E.2d 817, 823. Our unanimous opinion emphasized that under the Ind. Code § 35–50–2–9(c)(7), "any other circumstances appropriate for consideration" may be submitted as mitigating factors. Justice Givan wrote for the Court: "In the absence of any evidence of mitigating circumstances, which as discussed above may include virtually anything favorable to the accused, or of evidence to rebut the existence of the charged aggravating factors, a death sentence is a foregone conclusion." *Id.* at 822

Defense counsel's statements at the close of the guilt phase, inconsistent use of intoxication as a mitigator, and failure to develop and present mitigating evidence fall below the standard of reasonable performance under prevailing professional norms. A jury and a judge hearing the recently developed mitigating evidence could perhaps properly conclude that death was the appropriate penalty. The cumulative effect of these acts and omissions, however, is sufficiently serious to lead us to view a decision made under these circumstances as unreliable, warranting reversal of appellant's death sentence.

---

**7.** Q: Is there any doubt in your mind that the person you identified in your statement as Gary Williams is one and the same Gary Burris?
A: Yes, he is the same one. I heard a lot of people say his name was Williams. I never did know his last name.
Q: How is it that you now say his name is Burris?
A: How do I know? 'Cause I talked to his mother.

Record at 777.

**8.** Q: ... did you know Gary Burris in advance of the seventh (7th) of February?
A: Knew of him ...
Q: All right ...
A: ... through his father.
Q: You knew his father.
A: Uh huh.
Record at 973–74.

### III. *Instruction Error*

 Burris also sought post-conviction relief on the grounds that the trial court's final instruction defining felony murder was in error. The post-conviction court found that Burris had waived this issue by failing to present it on direct appeal. A party may seek post-conviction relief on those issues not known or available on direct appeal. *Bailey v. State* (1985), Ind., 472 N.E.2d 1260.

 Burris does not explain his failure to challenge the instruction during his direct appeal. Instead, he asserts that the error constitutes "fundamental error apparent on the face of the record," citing *Young v. State* (1967), 249 Ind. 286, 289, 231 N.E.2d 797, 799. In *Young,* this Court vacated a judgment of conviction for the non-existent offense of "assault and battery with intent to commit a felony: manslaughter." This Court refused to uphold either the judgment which followed no legal authority or the sentence which could not be justified under any statute. By contrast, Burris alleges that at his trial, the court erred by giving an instruction defining felony-murder in words which tracked the statutory definition. Burris says the court erred because of a "latent defect in the statutory scheme." A defect cannot be both "latent" and "apparent on the face of the record." Burris' facile claim about the definition of the offense is barred.

### IV. *Conclusion*

We reverse the post-conviction court's finding that Burris was not denied the effective assistance of trial counsel at the penalty phase of his trial. We vacate the death penalty and remand for a new sentencing hearing. The post-conviction court is otherwise affirmed.

DeBRULER and DICKSON, JJ., concur.

GIVAN, J., dissents with opinion in which PIVARNIK, J., joins.

GIVAN, Justice, dissenting.

Notwithstanding performance of trial counsel at the presentence phase, the trial judge was the ultimate decision maker. He had the presentence investigation before him. I would not override his judgment.

PIVARNIK, J., concurs.