James P. HARRISON, Appellant
(Petitioner below ),

v.

STATE of Indiana, Appellee
(Respondent below ).

No. 65S00–9605–PD–318

Supreme Court of Indiana.

Feb. 9, 1999.

Rehearing Denied May 18, 1999.

Susan K. Carpenter, Public Defender of Indiana, Thomas C. Hinesley, Joanna Green, Deputy Public Defender, Robert E. Lancaster, Special Assistant to the State Public Defender, Indianapolis, Indiana, attorneys for appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Priscilla J. Fossum, Deputy Attorney General, Indianapolis, Indiana, attorneys for appellee.

BOEHM, Justice.

James P. Harrison was convicted of two counts of murder and one count of arson, as well as being an habitual offender. He was sentenced to death on both murder counts. He appeals the denial of his petition for postconviction relief, primarily challenging the effectiveness of his trial and appellate counsel. He also contends that he was denied his constitutional right to be present during the penalty phase of his trial, that the State's misconduct at trial undermined the reliability of his convictions and death sentences, and that he was denied a full and fair postconviction hearing. We affirm the trial court's denial of postconviction relief.

**Factual and Procedural Background**

The facts of this case are reported in *Harrison v. State,* 644 N.E.2d 1243 (Ind.1995). In brief, the bodies of twenty year old Stacy Forsee, her three and one-half year old daughter Tia Forsee, and her twenty-one month old son Jordan Hanmore were found in the charred remains of Stacy's home in the early morning hours of January 17, 1989. Stacy had been stabbed and the children had died in the fire. After an investigation that spanned more than two years, Harrison was charged with arson, the knowing murders of Stacy and Tia, and the felony murder of Jordan. The evidence presented at trial included the following: (1) Harrison was observed near the fire scene on the night of the murders before the fire trucks arrived; (2) Harrison had purchased kerosene days before the murders; (3) the fire had been started by a flammable liquid; (4) Harrison told fellow inmates in a Maryland jail that he had committed the crimes; and (5) DNA evidence discussed below. *Id.* at 1247. The jury acquitted Harrison of Stacy's murder, but found him guilty of the remaining counts. The jury recommended that Harrison be sentenced to death for the murders of both Tia and Jordan, and the trial court imposed the death sentence on both counts. We initially affirmed the convictions but remanded the case for a more specific sentencing order. The death sentences were affirmed after remand. *Harrison v. State,* 659 N.E.2d 480 (Ind.1995). Harrison then filed a petition for postconviction relief. After a four-day hearing, the trial court denied relief, and this appeal ensued.

At the hearing on his petition for postconviction relief, Harrison had the burden of establishing his grounds for relief by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5). Because he is now appealing from a negative judgment, to the extent his appeal turns on factual issues Harrison must convince this Court that the evidence as a whole was such that it leads unerringly and unmistakably to a decision opposite that reached by the postconviction court. *Spranger v. State,* 650 N.E.2d 1117,

1119 (Ind.1995). We will disturb the decision only if the evidence is without conflict and leads only to a conclusion contrary to the result of the postconviction court. *Id.* at 1119–1120.

## I. *Cronic* Claim

Harrison initially contends that "the circumstances under which trial counsel labored were so unfair and arbitrary that [he] was denied his right to counsel." He contends that these circumstances were sufficiently egregious that they create a presumption of ineffective assistance of counsel under *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). As we recently noted in *Minnick v. State,* 698 N.E.2d 745, 751 (Ind.1998), *Cronic* provides a narrow exception to the traditional ineffective assistance of counsel analysis under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In particular, *Cronic* delineates three circumstances that avoid the *Strickland* requirement that a defendant establish both deficient performance and actual prejudice: (1) the complete denial of counsel; (2) a complete failure by counsel to subject the State's case to meaningful adversarial testing; and (3) the circumstances of the trial are such that, "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Minnick,* 698 N.E.2d at 751–52 (quoting *Cronic,* 466 U.S. at 659–60, 104 S.Ct. 2039). Harrison contends that he falls in the third category based on his view that "[t]he unique and untenable circumstances under which [his] trial lawyers labored were so restrictive as to render them helpless and thus constructively denied [him] his right to counsel."

Harrison draws our attention to several factors in support of his *Cronic* claim: (1) the trial court's scheduling of his case and his trial counsel's concurrent representation of another capital defendant; (2) the "disparity of resources" between the State and defense; (3) the exclusion of evidence that other people "could have" committed the crimes; and (4) the State's loss of allegedly material evidence.[1] To prevail on this claim, Harrison must prove that the "surrounding circumstances completely deprived [him] of any meaningful opportunity to subject the State's evidence to adversarial testing." *Minnick,* 698 N.E.2d at 752. The postconviction court did not enter findings on the *Cronic* claim; accordingly, no deference to the trial court's conclusion is due under *Spranger v. State,* 650 N.E.2d 1117, 1119–20 (Ind.1995).

At Harrison's initial hearing on April 29, 1991, Thomas Swain and Ronald Warrum were appointed as his counsel and the trial was set for January 6, 1992, and also as a second-choice setting for November 6, 1991. The first choice setting for November 6 was another unrelated death penalty case in which Swain and Warrum were also appointed to represent the defendant Jeffrey Paul. At a pretrial conference on August 19, the State, citing concerns about the availability of

1. Harrison makes several other contentions under this heading, but these are subject to summary disposition. First, the admissibility of DNA evidence and denial of his motions for continuance and for the appointment of a DNA expert were resolved against Harrison in his direct appeal. *Harrison,* 644 N.E.2d at 1250–54. His trial counsel cannot be presumed ineffective based on these rulings. *See also* Part VI.B., *infra.* Second, although Harrison discusses the denial of his pre-trial motion for change of judge, he does not argue that it was erroneously denied. Indeed, this Court held on direct appeal that the trial court did not abuse its discretion in denying this motion. *Id.* at 1249. Harrison's argument in this appeal is that the trial court's refusal to reimburse trial counsel for the cost of litigating that motion and seeking mandamus in this Court upon its denial "underscores [the trial court's] hostility towards trial counsel." In the course of complicated and lengthy litigation, trial judges will inevitably express some degree of dissatisfaction with counsel. The trial court's "palpable displeasure" with defense counsel for pursuing a change of judge motion does not justify a presumption of prejudice under *Cronic.* Finally, Harrison alleges that the State "repeatedly" violated the court's order on his motion in limine, but refers us to arguments made in Parts II and V of his brief. This issue is addressed in Part II of this opinion as it bears on ineffective assistance of counsel and in Part V as it relates to a claim of prosecutorial misconduct. For essentially the same reasons set forth in Part II, the claimed violations do not justify a presumption of ineffectiveness under *Cronic.*

two inmate "snitches" who were to testify against Harrison, requested that Harrison's case be tried on November 6 instead of Paul's. The trial court responded by continuing Paul's trial to April 1992 and advancing Harrison's to the first choice setting for November 6.

At the time of this swap of trial settings, defense counsel had been representing Harrison for three and one-half months. The swap required Swain and Warrum to shift their focus to concentrate on Harrison's case, but they still had in excess of two and one-half months to prepare for Harrison's trial. Although several motions in Paul's case were also used in Harrison's, the concurrent representation of Paul undoubtedly distracted Harrison's counsel from his defense.[2] Nonetheless, "with respect to trial court's refusal to grant the defense additional time to prepare for trial ... great deference must be shown to trial courts, because of the scheduling problems they face." *Cronic,* 466 U.S. at 662 n. 31, 104 S.Ct. 2039.[3] Under these circumstances, neither the concurrent representation of Jeffery Paul nor the amount of time given to prepare Harrison's case justifies a presumption of prejudice under *Cronic.*

Next Harrison points out the "disparity" between his resources (Swain, Warrum, two paralegals who assisted in compiling records, and limited use of an investigator in Baltimore) and those of the State (detectives and forensic experts from the Indiana State Police, and a variety of resources of the Mt. Vernon Police Department, the Posey County Sheriff's Department, the Indiana State Fire Marshal's Office, the Baltimore Police Department and two DNA laboratories). In particular, he argues that defense counsel were "unable to thoroughly investigate the two snitches" because they were denied funds to travel to Baltimore or to use the investigator in Baltimore for more than twenty hours. As the trial court correctly noted at a pretrial hearing on the matter, the investigator in Baltimore was to locate the witnesses. The investigator could then record his conversations with the witnesses or counsel could speak to the witnesses on the telephone. The fact that the State's agents made several trips to Baltimore during the course of the investigation did not ipso facto compel the trial court to grant Harrison greater funds to conduct his own independent investigation there.[4] With the possible exception of impeaching evidence on a collateral point discussed below, Harrison does not suggest what, if anything, additional investigation in Baltimore would have produced.[5]

2. Although Paul's trial was continued to April of 1992, Swain and Warrum continued to represent Paul until the morning that Harrison's trial began. At that time the trial court, citing amendments to Criminal Rule 24 that were to take effect on January 1, 1992, gave Swain and Warrum the "opportunity" to withdraw from Paul's case. Warrum withdrew and the trial court ordered Swain's appearance withdrawn.

3. Cronic's attorney was given only one month to prepare a case that the Government had spent four and one-half years investigating. *Cronic,* 466 U.S. at 649, 104 S.Ct. 2039.

4. The denial of funds to hire an investigator is a matter within the sound discretion of the trial court, and the defendant bears the burden of establishing the need for this expense. *Tidwell v. State,* 644 N.E.2d 557, 560 (Ind.1994). Although we agree with Harrison that the snitch testimony was important to his case, Harrison has not shown that the trial court abused its discretion by not authorizing more than twenty hours of investigation.

5. Harrison also states that "[d]efense counsel had no assistance for their local investigation," but does not suggest what a local investigator may have discovered. Harrison did not request funds for a local investigator, and it is wholly speculative to conclude that a showing of need could have been made or that such a request would have been granted. In his reply brief, Harrison lists several things that a local investigator "might have" or "could have" done. Apart from the belated raising of these points, each seems to be guided largely by hindsight. For example, he suggests that an investigator might have produced Barbara Washington's denial of having seen Sheila Stewart near the time of the fire (*see* Part II.A., *infra*), but does not explain how an investigator or Harrison's attorney could have uncovered this before Stewart's testimony, or why after that testimony, an investigator would have made a difference. Thus, although raised as a *Cronic* presumption, it does not establish ineffective assistance. And as a *Cronic* claim, there is no basis to presume counsel ineffective based on the trial court's failure to appoint a local investigator who was never requested.

The trial court granted the State's Motion in Limine that prohibited the defense from making any reference at trial to other suspects in the case. Harrison argues that this ruling denied him effective representation because it prevented him from "meaningfully present[ing] his defense of innocence." [6] Harrison notes that at one time investigators suspected that Charles Hanmore, Stacy's ex-boyfriend and the father of Jordan, might have committed the crimes. At the time of Harrison's trial, the standard for admissibility of evidence of other potential perpetrators was that it "must do more than cast suspicion or raise a conjectural inference that a third party committed the crime; it must directly connect the third party to the crime charged." *Burdine v. State,* 515 N.E.2d 1085, 1094 (Ind.1987). Harrison points to evidence that Hanmore may have wanted to reconcile with Stacy, was physically abusive and threatening to her in the past, was six weeks behind on child support, and was involved in an unrelated arson. These at best cast a cloud of suspicion on Hanmore, but do not directly connect Hanmore to these crimes. The police thoroughly investigated Hanmore as a suspect and took detailed statements from him the day after the killings.[7] Although Harrison focuses on the parts of the statements that demonstrate problems in the relationship between Hanmore and Stacy, he offers nothing to connect Hanmore to the crimes.[8] Harrison—not Hanmore—bought kerosene days before the murders, was seen near Stacy's burning house before the fire trucks arrived, and told two inmates in a Baltimore jail that he had committed the crimes. Harrison is not entitled to a presumption of ineffectiveness under *Cronic* based on a legally correct ruling by the trial court.[9] Even if the current Indiana Rules of Evidence would approve the admissibility of this evidence, *cf. Joyner v. State,* 678 N.E.2d 386, 389–90 (Ind.1997), the failure to anticipate or effectuate a change in the existing law does not constitute ineffective assistance under *Strickland. See, e.g., Bailey v. State,* 472 N.E.2d 1260, 1264–65 (Ind.1985). This is particularly true where the change was the result of a prospective rule, not decisional law.

As a final point, Harrison argues that the State lost material evidence, namely the audio tape of a statement given by Stacy to police in August 1988 and the original 911 tape from the morning of the fire. In the 1988 statement, Stacy had told the police that she believed she was being followed. This statement was taken in August, and Harrison did not arrive in Mt. Vernon until September. Although the tape recording of the statement was apparently lost, testimony about the substance of that statement was

6. Harrison also notes that the State's Motion in Limine prohibited any reference to his relationship or lack thereof with Stacy Forsee, Forsee's statement to the State Police in the summer of 1988, and the presentation of alibi evidence (based on the belated filing of the alibi notice). Harrison cites no authority and makes no argument in this regard beyond the conclusory statement that he was denied "his right to meaningfully present his defense of innocence." These rulings do not warrant a presumption of prejudice under *Cronic.*

7. Hanmore appears to have been cooperative and forthright with the police. For example, when asked whether he owned any knives and how he would feel about giving the police a knife "for some examinations," Hanmore replied: "Have them all, everything I got down there. That's ... if you're getting up to the point of implicating me, you can search my house. You can do anything you wanted, cause I don't want to be implicated that I was the one that done this."

8. Both in his brief and at oral argument, Harrison noted that, less than one day after the fire, Hanmore knew that Stacy and Jordan were found by the sofa and Tia was found in the back of the house. Hanmore claimed at the time to have heard this information on the radio or from his mother. Although radio transcripts do not reflect the broadcast of this information, Harrison provides nothing to indicate the this information could not have come from Hanmore's mother or for that matter from anyone else in what Harrison has characterized as "the small, close-knit town of Mt. Vernon." In light of the circumstances, Hanmore's knowledge of the location of the bodies cannot be said to connect him directly to the crimes.

9. Harrison also mentions other suspects in addition to Hanmore. The evidence connecting these other individuals to the crimes is even more attenuated than the evidence relating to Hanmore and accordingly does not satisfy the *Burdine* standard.

available to the defense and offered at the hearing on the motion for change of judge. The contents of the 911 tape were similarly available to the defense. Harrison argues that the 911 tape would have contradicted the testimony of Sheila Stewart, who testified that she reported the fire by demonstrating that only Barbara Washington reported the fire. Although the 911 tape was lost, the dispatch log was admitted into evidence at the postconviction hearing—and presumably available to the defense prior to trial—and notes that the only call reporting the fire was from Washington. The tape was at best cumulative of this evidence.[10] Neither item approaches the level of "material exculpatory" evidence. Rather, each was at best "potentially useful." Harrison does not allege that the State was acting in bad faith when it lost either item. "[U]nless a defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); *see also Samek v. State,* 688 N.E.2d 1286 (Ind. Ct.App.1997), *trans. denied.*[11] Nor has he demonstrated any prejudice as the result of the loss of either item because the content of each was available through other sources. The State's loss of this arguably cumulative evidence does not rise to the level of justifying a presumption of ineffectiveness of Harrison's counsel.

In sum, whether considered individually or collectively, the circumstances surrounding the representation of Harrison are not of the "extreme magnitude" necessary to presume counsel ineffective under *Cronic. See Minnick,* 698 N.E.2d at 751.

Finally, Harrison suggests that his trial lacked "reliability required under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and Article One, Sections Twelve and Thirteen of the Indiana Constitution." Harrison cites to no cases and makes no separate argument beyond the general *Cronic* analysis set forth above. Any other claims based on these constitutional provisions are waived for failure to present a cogent argument. Ind. Appellate Rule 8.3(A)(7).

## II. Ineffective Assistance of Counsel under *Strickland*

In addition to asserting a presumption of prejudice under *Cronic,* Harrison asserts traditional ineffectiveness claims as to his representation during each of the guilt phase, the penalty phase, and the sentencing hearing. To prevail on this claim, Harrison must show that (1) counsel's performance fell below an objective standard of reasonableness based on prevailing professional norms; and (2) there is a reasonable probability that because of counsel's errors the result of the proceeding is unreliable or unfair. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see also Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). As to the first prong, there is a strong presumption that counsel's performance was not deficient, and a defendant must overcome that presumption with strong and convincing evidence. *Taylor v. State,* 689 N.E.2d 699, 705 (Ind.1997). As to the second prong, a "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

The postconviction court rejected Harrison's claim of ineffective assistance of counsel and found that Harrison's trial counsel "met the reasonableness standards" of *State v. Van Cleave,* 674 N.E.2d 1293 (Ind. 1996), *reh'g granted in part,* 681 N.E.2d 181

10. Neither Harrison nor the State mentions the possibility that the 911 tape might include a call from Stewart. If this were the case, the loss of the tape is actually beneficial to Harrison. Because there is no way to determine its content, however, we can only conclude that the tape was—in the best case scenario for Harrison—cumulative of the dispatch log.

11. The State's good faith is irrelevant as to "material exculpatory" evidence, which "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Samek,* 688 N.E.2d at 1288 (quoting *California v. Trombetta,* 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)).

(Ind.1997), *cert. denied* — U.S. —, 118 S.Ct. 1060, 140 L.Ed.2d 121 (1998).[12]

A. *Guilt Phase*

Harrison draws our attention to several specific instances of alleged trial counsel ineffectiveness in the guilt phase of his trial: (1) failure to renew a motion for change of venue; (2) failure to file a timely notice of alibi or make an offer to prove an alibi at trial; (3) failure to object to references of his incarceration for another crime; (4) failure to hire an eyewitness testimony expert and adequately challenge eyewitness testimony; (5) failure to make a pretrial motion to suppress based on the suggestive nature of a photo array; (6) failure to raise a sufficient challenge to inmate "snitch" testimony; and (7) failure to employ a fire investigator to challenge the State's arson case.[13]

Harrison first argues that trial counsel were ineffective for failing to renew a motion for change of venue and for failing to file an alibi notice until two days before trial. Harrison's sole contention in regard to the venue issue is that his trial counsel testified at the postconviction hearing that there were "very serious problems" with venue that "were not eliminated by voir dire." We reviewed the transcript of voir dire on direct appeal and found no showing "that the jurors were unable to set aside any preconceived notions of guilt and render a verdict based upon the evidence." *Harrison*, 644 N.E.2d at 1249. Trial counsel cannot be declared ineffective for failing to renew a motion that was held on direct appeal to be without merit. Because Harrison presented no evidence at his postconviction hearing to support the belated alibi, there is no basis to conclude either that trial counsel were deficient or that Harrison suffered any prejudice from that issue.

Harrison also contends that the State, without objection from his attorneys, "elicited many references to other crimes by Harrison." The record citations provided, however, do not deal with other crimes committed by Harrison, but rather deal with one reference to use of "mug shots" of Harrison and others in a photo array and several references to Harrison's either being in jail or having a cellmate. It was inevitable that the jury would learn of Harrison's incarceration on another charge by virtue of the testimony of Robert Phifer and Gary Jarrell. Both testified that Harrison told them of his crimes while the three men were incarcerated in a Baltimore jail. Even if trial counsel's failure to object were not a tactical judgment, the probative value of this testimony outweighs any prejudicial effect of these allusions to his incarceration for some other unknown charge. Accordingly, the failure to object does not constitute ineffective assistance. *Lloyd v. State*, 669 N.E.2d 980, 985 (Ind.1996) (to prevail on an ineffective assistance of counsel claim based on counsel's failure to object, appellant must show that, had a proper objection been made, it would have been sustained). For the same reasons, a testifying detective's reference to a "mug shot" in describing the array shown to Stewart raises no substantial issue of prejudice.

Harrison contends that his trial attorneys were deficient for failing to mount an effective challenge to the eyewitness testimony at trial. In particular, he challenges his identification by Sheila Stewart, who placed him near Stacy's house as the fire was burning but before the fire trucks had arrived, and Pam Smith, who testified that Harrison bought kerosene from her at a hardware

12. Portions of the postconviction court's judgment suggest that Harrison's ineffective assistance of trial counsel claim was waived because it was not raised on direct appeal. The State also argues that this claim has been waived. *Woods v. State*, 701 N.E.2d 1208 (Ind.1998) made clear that a defendant may raise an ineffective assistance of trial counsel claim for the first time in a postconviction proceeding.

13. In addition to alleged deficiencies for the failure to seek funds to hire an eyewitness testimony expert and fire investigator discussed below, Harrison suggests that his counsel were deficient for not interviewing witnesses prior to the change of judge hearing. We held on direct appeal that the trial court did not abuse its discretion in denying the motion for change of judge. *Harrison v. State*, 644 N.E.2d 1243, 1249 (Ind.1995). Harrison's claim of ineffectiveness in this regard fails, however, because he makes no allegation, let alone any showing, of prejudice to support his claim.

store a few days before the fire. Warrum thoroughly cross-examined both of these witnesses. The cross-examination of Stewart spans nearly forty pages and that of Smith comprises another nine pages. Despite the fact that postconviction counsel may have asked more questions or different ones, Warrum's cross-examination of both witnesses was well within the bounds of competent representation.

Harrison also argues that trial counsel were ineffective for failing to seek an eyewitness identification expert to testify at trial. At the time of Harrison's trial, the admissibility of eyewitness expert testimony was an open question in Indiana. *See Farrell v. State,* 622 N.E.2d 488, 494 (Ind.1993) (declining to rule on the admissibility of such testimony on retrial, noting that the issue should be resolved under the pending Indiana Rules of Evidence); *cf. Reed v. State,* 687 N.E.2d 209, 211–14 (Ind.Ct.App. 1997). Even had this testimony been admissible, Harrison was not automatically entitled to the appointment of an expert witness to testify about eyewitness identifications. *See, e.g., Clark v. State,* 498 N.E.2d 918, 922 (Ind.1986), *abrogated on other grounds by Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). The denial of such a request, had one been made, would be evaluated for an abuse of discretion. *Id.* at 923. The postconviction court found that:

> [The eyewitness testimony expert] challenged the reliability of any and all eyewitnesses. Such general unreliability has been assimilated into the decision making of the public-at-large. It is reasonable to conclude that the jury reached its decision with allowance for possible error in identification as exemplified by trial counsel's thorough cross-examination.

It is at best wholly speculative that such a request would have been granted, or that the expert testimony would have affected the outcome of the trial. In view of all these considerations, Harrison's trial counsel's failure to request an eyewitness testimony expert does not overcome the strong presumption of counsel's competence.

Harrison argues that trial counsel should have made a pre-trial motion to suppress Stewart's identification of Harrison from a photo array. Stewart was shown pictures of six men. All of the pictures were in black and white and depicted the subjects both facing the camera and in profile. Harrison, unlike the other five, had a State of Virginia booking card around his neck. Instead of making a pretrial objection to this photo array on the basis that it was suggestive, defense counsel offered the photo array into evidence at trial and asked Stewart about differences among the photographs. Stewart noted that two of the men had light hair and five of the six (all but Harrison) did not have identifying numbers at the top. She did not, however, point out the fact that Harrison was the only one with a booking card around his neck. By asking these questions and then submitting the photographs to the jury for their own review, defense counsel pointed out the possible suggestiveness of the photo array to the jury. The same point was emphasized in closing argument. This line of inquiry, coupled with pointing out Stewart's delay of one year after the fire in coming forward with her account of viewing a person near the scene, was an important part of giving the jury a reason to discredit her testimony. This is a reasonable trial strategy—if not the best—that does not overcome the strong presumption of counsel's competence. *Cf. Allen v. State,* 686 N.E.2d 760, 778 (Ind.1997) (isolated poor strategy or bad tactics do not necessarily amount to ineffective assistance of counsel), *cert. denied,* — U.S. —, 119 S.Ct. 807, 142 L.Ed.2d 667 (1999).

Harrison also argues that his trial counsel were deficient in challenging the testimony of Robert Phifer and Gary Jarrell. Although Harrison makes an eloquent argument in this appeal about the unreliability of "snitch" testimony in general, he offers little to demonstrate that trial counsel's cross-examination of these witnesses was either deficient or prejudicial to him. Harrison asserts that Phifer received benefits for his statements and that Jarrell was motivated by hopes of benefit. Phifer had been incarcerated under a charge of unauthorized use of a motor vehicle. At Harrison's trial, Phifer told the jury that he had been given permis-

sion to use the car by the daughter of its owners and that the charges were stayed because the daughter was hospitalized as a result of a nervous breakdown. Affidavits submitted at postconviction stated that the daughter was not hospitalized and was available—and intended—to testify against Phifer. Trial counsel cross-examined both Phifer and Jarrell at some length, in addition to attempting to discredit their testimony in opening statement and closing argument. The jury knew that the two men were in jail. Counsel's failure to obtain the impeaching evidence offered at postconviction on this collateral point is not outside the range of acceptable counsel performance.

As a final point, Harrison argues that trial counsel were ineffective for failing to hire a fire investigator and challenge the State's arson case. He suggests that "[h]ad trial counsel effectively challenged the physical evidence on which the fire marshal relied, the fire would have been presumed accidental." With or without this legal presumption under *Ellis v. State,* 252 Ind. 472, 477, 250 N.E.2d 364, 366 (1969), *overruled in part on other grounds by DeVaney v. State,* 259 Ind. 483, 489–90, 288 N.E.2d 732, 736–37 (1972), given that one of the bodies found in the fire had died from stab wounds, it seems improbable that an accidental fire would be the conclusion of the jury. In any event, at trial the State offered the testimony of Bruce Boaz, a chemist for the Indiana State police who testified that he tested samples from the house and found no traces of flammable liquid. The State also offered the testimony of Deputy Fire Marshal Fowler who concluded, based on burn patterns and other factors, that the fire had been started by an accelerant. At the postconviction hearing, Harrison presented expert testimony from Richard Custer, the former chair of the National Fire Protection Association. Based on his review of photographs and documentary evidence in the case, Custer testified that the evidence relied on by Fowler in concluding that the fire was arson also would be found in fires that are not started by an accelerant. Custer admitted on cross-examination, however, that the evidence "could be consistent with an intentionally set fire[.]"

The postconviction court found that (1) attempting to show there was no arson would have been inconsistent with Harrison's theory of defense that he did not commit the crimes and (2) counsel were not ineffective for not seeking or using an arson expert. Harrison's theory of defense was that someone else committed the crimes, not that the fire was accidental. Accordingly, his trial counsel focused their attack on whether the liquid accelerant used to start the fire was kerosene, which a witness testified she saw Harrison purchase days before the fire, or one of three or four hundred other flammable liquids. Because defense counsel's strategy was reasonable under these facts, Harrison has failed to establish deficient performance under *Strickland.*

In sum, Harrison's trial counsel rendered effective assistance during the guilt phase of his trial. Although hindsight allows Harrison to now question isolated incidents in which something might have been done differently, Harrison's defense at trial, taken as a whole, was adequate.

B. *Habitual Offender Phase*

Harrison next contends that his trial counsel were ineffective for proceeding with the habitual offender phase of his trial before the death penalty phase. After the jury returned its guilt phase verdicts, the trial court gave Harrison's counsel the option of proceeding with either the penalty phase or the habitual offender phase. They chose the latter. During the habitual stage, the jury was advised of Harrison's prior convictions for involuntary manslaughter and second-degree murder. Harrison argues that he was prejudiced by his trial counsel's decision because, had the death penalty phase been heard first, the manslaughter conviction would not have been known to the jury during the penalty phase.[14]

As to the first prong of *Strickland,* Harrison has not established that his trial coun-

14. The second-degree murder conviction was used as a statutory aggravator during the penalty phase.

sel's decision fell below an objective standard of reasonableness. Trial counsel argued to the jury during the penalty phase, "if you do not recommend the death penalty, the sentence enhancement as an habitual offender will give you a total maximum sentence of two hundred years." This is remarkably similar to defense counsel's closing argument in *Canaan v. State,* in which the jury was told that the defendant's habitual offender status "will require him to spend the rest of his life in prison." 683 N.E.2d 227, 231 (Ind.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 2064, 141 L.Ed.2d 141 (1998). In *Canaan,* the postconviction court found trial counsel had made strategic use of the habitual offender adjudication during the penalty phase and that the decision to try the habitual phase first would not likely have produced a different result in the penalty phase. *Id.* In that case, we affirmed the postconviction court's conclusion that this decision did not constitute the ineffective assistance of counsel.

Harrison argues that his case is distinguishable because (1) his trial counsel did not make strategic use of the habitual offender adjudication and (2) the postconviction court did not make any such finding.[15] Harrison cites to the postconviction testimony of both of his counsel in which neither recalled any strategic reason to hold the habitual offender proceeding first.[16] However, trial counsel clearly took advantage of the habitual offender adjudication during closing argument in the penalty phase. This conclusion is not changed by their inability at the postconviction hearing to recall the basis for this decision. As in *Canaan,* we conclude that Harrison was not denied the effective assistance of counsel by this decision of his trial counsel.

C. *Penalty Phase /Sentencing Hearing*

1. *The Record in the Penalty Phase and Sentencing Hearing*

Harrison also argues that his trial counsel were ineffective during the penalty phase of his trial and at his sentencing hearing. The only evidence presented by Harrison during the penalty phase was fifty-four pages of military records. These records indicated that he had been injured while serving in Vietnam. Other portions of the records indicated that Harrison "was the product of broken home" and that his father had attempted to sodomize him as a child.[17] The records also discussed Harrison's problems as a juvenile and noted that he "had family problems" and had been a runaway. Although these records were admitted into evidence during the penalty phase, trial counsel did not specifically argue during closing argument that either Harrison's military service or difficult childhood was a mitigating factor. Instead, trial counsel argued to the jury that it should be merciful and recommend against the death penalty because Harrison would very likely be in prison for the rest of his life.

During the sentencing hearing, counsel presented letters from Harrison's mother and his two sisters. These letters discussed Harrison's service in Vietnam and its effect on him. The letters also discussed Harrison's extensive abuse as a child: "He suffered sexual, physical, mental and emotional abuse. I remember that little boy[']s screams. I saw the torment." The trial court also considered the presentence report which noted that Harrison's "grandmother and father consistently abused him both physically and mentally" and that he was placed in a county children's home. Another

15. The postconviction court's findings on this issue instead focused on the likelihood that the jury would give "closer scrutiny to this purely administrative stage before they recommended a Death Sentence. The trial attorneys selected the procedure which gave Mr. Harrison the best opportunity for finding in his favor on the Habitual Offender allegation." Although our review of the record does not lead us to an opposite conclusion, we resolve this issue instead based on our recent opinion in *Canaan.*

16. Warrum simply answered "no" to the question, but Swain stated that "that was our choice.... It escapes my memory now why."

17. Other portions of the military records portrayed Harrison in a somewhat negative light. For example, Harrison was demoted and confined to hard labor for two months as a result of being AWOL. An "undesirable discharge" was recommended as the result of Harrison's "unfitness, on the specific basis of frequent involvement of a discreditable nature with military authorities."

portion of the report noted that Harrison "reported that, as a child, he was abused physically, sexually, and mentally." The presentence report also discussed Harrison's service in Vietnam, indicating that he was awarded "the Vietnam Service Medal, Combat Action Ribbon, a 24–hour Purple Heart and a 48–hour Purple Heart."

During the sentencing hearing, Harrison's trial counsel argued that his military service and "disturbed childhood" were mitigating circumstances. Trial counsel relayed that, as a result of his Vietnam service, Harrison slept with a bayonet under his pillow. On one occasion when Harrison's half-brother woke him up, Harrison was so startled that he thought he was still in Vietnam and went after him with the bayonet. Moreover, trial counsel related stories about Harrison's difficult childhood, noting that Harrison had been molested as a child and had been beaten with a bicycle or dog chain by his grandmother. The grandmother had sawed his bicycle in half because he refused to allow his brothers to borrow it and had often refused him dessert—for no reason—while his other siblings were given it.

The trial court's sentencing statement indicates that it considered these mitigating factors:

> It is hard for me to put myself in your place as a child rejected by his parents. Physically, sexually and emotionally abused from place to place and from home to home and none of them really a home. It is really difficult for me to put myself in your position and think about how difficult it must have been.

The trial court also found Harrison's Vietnam service to be mitigating: "Many people dodged the draft in Vietnam. Lied about it. Were cowardly, sat home and let other people do their work but you went and you are to be commended for that because service to your country is very important. So I have considered that strongly." After weighing the mitigating circumstances against the aggravating circumstances, the trial court imposed the death sentence for the murders of both Tia and Jordan.

2. *Contentions as to the Penalty Phase*

Harrison contends that trial counsel were ineffective for failing to present additional mitigating evidence to the jury during the penalty phase. At the postconviction hearing, Harrison presented a variety of evidence that he now argues should have been presented to the jury during his penalty phase and to the trial court at his sentencing hearing. This evidence included: (1) extensive sexual and emotional abuse as a child; (2) traumatic experiences during his service in Vietnam and the alleged intensification of his childhood post-traumatic stress disorder (PTSD); and (3) repeated rapes while an inmate in the Virginia Department of Corrections.[18]

The postconviction court found that trial counsel were not ineffective for failing to present this evidence. In particular, the postconviction court noted that Harrison's "unfortunate childhood experiences, his military experience and his experience with previous incarceration were known to the Jury and the Trial Judge." In addition, the postconviction court found that the testimony from the postconviction hearing was cumulative except for (1) damaging revelations of Harrison's childhood fascination with setting fires; (2) sex slave matters (during his incarceration in Virginia) that were neither exculpatory nor mitigating as to the murders of children by arson; and (3) the revelation that Harrison killed an unarmed mother and child during his service in Vietnam. Harrison contends that the postconviction court took testimony out of context and "construed some of the most compelling mitigating evidence in an aggravating light." Although Harrison is correct in his assertion that at least some of postconviction evidence may fairly be categorized as mitigating, this by no means compels us to conclude that he was denied the effective assistance of counsel by virtue of his trial counsel's failure to present all of this evi-

18. Harrison also contends that his trial counsel should have requested a mental health examination before the close the penalty phase and suggests that they should have also requested funds for a mitigation specialist. He makes no separate argument in this regard, and the analysis set forth in this part of our opinion addresses the postconviction testimony of Harrison's experts.

dence or that the postconviction court's finding of trial counsel effectiveness is erroneous.

This Court realizes the potential importance of presenting mitigating evidence, especially in capital cases. We have previously found the failure to present mitigating evidence to constitute the ineffective assistance of counsel, warranting the vacation of a death sentence. *See, e.g., Burris v. State,* 558 N.E.2d 1067 (Ind.1990); *Smith v. State,* 547 N.E.2d 817 (Ind.1989). Our opinions in both *Burris* and *Smith,* however, were predicated in large part upon trial counsel's failure to investigate mitigating evidence. *Burris,* 558 N.E.2d at 1074–76 (reversing a death sentence based on the inconsistent presentation of intoxication as a mitigator, the failure to investigate mitigating evidence, and the availability of "substantial" mitigation evidence as demonstrated by its presentation at the postconviction hearing); *Smith,* 547 N.E.2d at 822 (reversing a death sentence because of counsel's "failure to prepare for the penalty phase"). Indeed, we noted in *Burris* that "an attorney who makes a reasonable decision not to present evidence that his client had an exceptionally unhappy and unstable childhood after some investigation of the client's background, complies with the dictates of *Strickland.*" 558 N.E.2d at 1075 (citing *Burger v. Kemp,* 483 U.S. 776, 794–95, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987)).

Although trial counsel's investigation into mitigating evidence in Harrison's case may not have been as extensive as that undertaken by trial counsel in *Burger,* it nonetheless satisfies the Sixth Amendment. Swain, a former trial judge, testified that he was primarily responsible for the penalty phase and sentencing. When asked about his attempts to secure records from Harrison's background, Swain testified that he attempted to get records from the Virginia prison system and did secure Harrison's military records. In response to a question about "the defense theory at the penalty phase," Swain testified that he wanted to use Harrison's mother and stepfather as witnesses. However, Harrison "would not allow us to use his mother as she was ill." Swain also indicated that he did not want to use Harrison's mother as a witness because "she was never what I thought a stable witness, so I was really quite worried about how she would testify." The postconviction court found—and Harrison does not dispute—that not calling Harrison's stepfather was a reasonable decision because he had told a police officer that he "believed Mr. Harrison had committed the murders and that Mr. Harrison was a pathological liar."

Harrison does not specifically argue in this appeal that his trial counsel should have called his mother and stepfather as penalty phase witnesses.[19] Instead, he suggests that other witnesses should have been called. His sister, Linda Hart, testified at postconviction regarding several incidents from Harrison's difficult childhood. However, she also testified that he had set a mattress on fire while she was in the bed and had set fire to a house when he was a child. The postconviction court found that Hart's testimony, if presented at trial, "would have confirmed behavioral characteristics of Mr. Harrison that may have bolstered the State's case." Similarly, postconviction testimony of Robert Kaplan and Pamela Porter, who both testified that Harrison suffered from post-traumatic stress disorder, had it been presented at trial, would have included information potentially damaging to Harrison, including drug and alcohol abuse and poor impulse control. The testimony of Timothy Hermsen, who served in the Marines with Harrison in Vietnam, would have provided some insight into Harrison's battlefield experiences and the resulting residual problems, but the presentation of evidence of prison rapes would have further drawn the jury's attention to Harrison's prior crimes and lengthy incarceration.

The jury was plainly presented with less mitigating evidence during the penalty phase than was offered to the trial court at the sentencing hearing. Although the reasoning behind the decision not to present more mitigating evidence and not to argue mitigating evidence to the jury during the penalty phase is not entirely clear from the postconviction testimony of Swain, it is clear that (1) some

19. Neither testified at the postconviction hearing. The parties stipulated at the postconviction hearing that Harrison's mother died on March 6, 1993.

investigation was conducted into mitigating evidence regarding Harrison's childhood and Vietnam service and (2) the presentation of additional mitigating evidence would have likely resulted in the jury's being exposed to information that also casts Harrison in a negative light. Instead of facing this risk, trial counsel argued that the jury should be merciful in not recommending the death penalty and that Harrison would very likely be spending the rest of his life in prison.

This is not a case in which defense counsel failed to conduct any investigation into mitigating evidence. *Strickland* discussed counsel's duty to investigate at some length:

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690–91. Harrison's military service and difficult childhood were investigated by trial counsel and presented, to some extent, to the jury by records secured by trial counsel. In view of the problematic nature of the testimony of Harrison's mother and stepfather, trial counsel cannot be deemed unreasonable for failing to seek the testimony of these witnesses. Counsel's decision to rely on a plea for mercy and argument that Harrison would be spending the rest of his life in prison, rather than arguing mitigating evidence, fails to establish deficient performance under these circumstances. *Cf. Darden v. Wainwright,* 477 U.S. 168, 186–87, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (finding no deficient performance for failing to present any mitigating evidence and instead relying on a simple plea for mercy during the sentencing phase of capital trial by noting that the mitigating evidence would have been accompanied or countered by negative information about the defendant).

In sum, the postconviction court found that the mitigating evidence offered at the postconviction hearing was cumulative except for negative information revealed about Harrison and that, to the extent any of the new matters were mitigating, they did not outweigh the aggravating circumstances proved beyond a reasonable doubt. The evidence does not lead unmistakably and unerringly to the opposite conclusion reached by the postconviction court. *See Spranger,* 650 N.E.2d at 1119–20.

3. *Sentencing Hearing*

As discussed above, trial counsel presented and argued mitigating evidence at Harrison's sentencing hearing. At the sentencing hearing the trial court attached considerable weight to the aggravating circumstances, concluding that they "far outweigh" the mitigating factors. Moreover, the postconviction court found that the mitigating evidence presented at the postconviction hearing did not outweigh the aggravating factors proved beyond a reasonable doubt by evidence at trial and sentencing. Harrison has not demonstrated in this appeal that the evidence leads unerringly and unmistakably to an opposite conclusion. *Id.*

## III. The Right to be Present at Penalty Phase

Harrison argues that he was denied his right under the federal and state constitution to be present during the proceedings. *See* U.S. Const. amends. 6 & 14; Ind. Const. art. I, § 13. As a preliminary matter, we note that this issue was available but not raised on direct appeal. Therefore, the issue is generally not available in a postconviction proceeding. *Lowery v. State,* 640 N.E.2d 1031, 1036–37 (Ind.1994). However, because the issue is also raised by Harrison in support of a claim of ineffective assistance of appellate counsel, we choose to address the issue on its merits.[20]

20. This issue was raised in Harrison's petition for postconviction relief but the postconviction

On November 14, 1991, the jury returned guilty verdicts as to three of the four counts against Harrison. Later that same day, the jury found Harrison to be a habitual offender. Harrison initially stated that he wished to absent himself from the habitual offender proceeding, but after being advised of his right to be present, decided to remain. He did not mention any health problems at that time.

Harrison was not in the courtroom the following morning as the trial court was prepared to begin hearing evidence in the penalty phase. The trial judge, while in open court with counsel for the State and defense present, telephoned Harrison, who was still at the jail. The trial court thoroughly advised Harrison of his right to be present, and Harrison indicated that he understood this right and had no questions regarding it. Subsequent to this colloquy, the trial court asked defense counsel if they had any questions of Harrison. Counsel responded that Harrison had said he was ill. The trial court then questioned Harrison:

> THE COURT: [Defense counsel] has indicated that you say you are not feeling well, do you not feel well enough to come to Court?
>
> HARRISON: No, sir, I do not.
>
> THE COURT: And what is the nature of your illness.
>
> HARRISON: I have been sick for three weeks, Your Honor. I have been fighting the flu. I have got diarrhea. I am sick. I can't hardly talk.
>
> THE COURT: Okay. All right. Is there anything you want to talk to your attorneys about before we start our proceedings? If so, I mean in private, not on the phone, of course.
>
> HARRISON: No, sir, I do not.
>
> THE COURT: Do you understand that we are going to call the Jury in, we are going to go to [sic] through the death penalty phase, and then they will make their verdict, and that you have an absolute right to be here and an absolute right to testify in your own behalf and an absolute right not to testify and to have the Jury instructed that they cannot consider that against you?
>
> HARRISON: Yes, sir.
>
> THE COURT: And if you don't appear you are going to be waiving at least some of those rights?
>
> HARRISON: Yes, sir.
>
> THE COURT: Anything else, counsel?
>
> MR. SWAIN: No, Your Honor.

The trial court then found that Harrison had made a knowing, intelligent, and voluntary waiver of his right to be present at the death penalty stage of his trial. Shortly after the telephone call ended, defense counsel moved for a continuance based on Harrison's claimed illness. The trial court called the Sheriff to the stand and questioned him about Harrison's health and the circumstances surrounding his refusal to come to court that morning.

> SHERIFF: I went back to the cell block and asked [Harrison] if he would change his mind. I understand he did not want to come to Court, and he said, "No, he did not. He did not have anything that he wanted to do up there, that they had embarrassed his family and he didn't want to put up with that bullshit anymore." I said, "Jim, we have been friends this long, if the Judge orders you, we will have to take you up there by force[,]" and he turned around real fast in his bunk, he was laying on his stomach, and he got real mad and he said, "Well there is going to be a hell of a fight." So I said, "Well, let me go talk to the Judge[,]" and that was our conversation.
>
> THE COURT: Did he say anything about not wanting to come because he was ill?
>
> SHERIFF: Yes, he did say, "I have been fighting this cold for three weeks[,"] and he did not sound as hoarse as he did on the telephone. He was very boisterous in his mad statement he made there, what I just said.

Harrison has both a federal and state constitutional right to be present during the penalty phase of his trial. *See* U.S.

court did not address the issue in its findings. We agree with Harrison that remand is not necessary because the facts supporting his claim are in the trial record and a legal argument is presented in his brief.

CONST. amends 6 & 14; IND. CONST. art. I, § 13; *Kentucky v. Stincer,* 482 U.S. 730, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987); *Ridley v. State,* 690 N.E.2d 177 (Ind.1997). However, this right may be waived if the waiver is knowing and voluntary. *Dodson v. State,* 502 N.E.2d 1333, 1337 (Ind.1987). Harrison contends that his waiver was not voluntary: "The options presented to Harrison were to come to court ill or not come to court." On appellate review, we consider the entire record to determine whether the right to be present was voluntarily and knowingly waived. *Slocumb v. State,* 568 N.E.2d 1068, 1070 (Ind.Ct.App.1991), *aff'd,* 573 N.E.2d 427 (Ind.1991). After his convictions during the guilt phase, Harrison indicated that he wanted to go back to the jail prior to the habitual offender phase. He did not mention any health problems at that time, but then changed his mind after being advised of his right to be present. When the Sheriff spoke to Harrison on the morning of his penalty phase, Harrison threatened physical resistance if he was forced to go to court and indicated that his reasons for absenting himself were that he had embarrassed his family and "didn't want to put up with that bullshit anymore." He did not tell the Sheriff that he was too ill to go to court. Moreover, during his telephone conversation with the trial court, Harrison did not state that his absence from court was the result of his illness. Rather, defense counsel brought up Harrison's illness after the trial court had explained Harrison's right to be present and was ready to conclude the phone call. In sum, the record demonstrates that whatever the extent of Harrison's illness, it was not so debilitating as the prevent him from appearing in court. *Cf. Dodson,* 502 N.E.2d at 1337. The trial court did not err in finding that Harrison voluntarily waived his right to be present.

Finally, Harrison suggests that the trial court erred in denying his counsel's motion for continuance based on his health. He concedes that his counsel did not comply with the statutory requirement that a continuance based on the illness of a defendant or witness be supported by oral testimony or a written statement of a physician or hospital official. *See* IND.CODE § 35-36-7-1(e) (1998). He cites *Vaughn v. State,* 590 N.E.2d 134 (Ind.1992), for the proposition that it is an abuse of trial court discretion, even in the face of noncompliance with the statute, to deny a continuance when prejudice to the defendant outweighs the competing interest of the State. *Vaughn* dealt with the unavailability of the only witness to be called by the defense because the witness was in labor. Harrison's absence was not caused by his illness but was rather a product of his own choice. The trial court did not abuse its discretion in denying the motion for continuance.

### IV. Effectiveness of Appellate Counsel

Harrison also argues that his appellate counsel was ineffective in his representation as to issues related to both the guilt and penalty phases of his trial. This argument is based largely on the postconviction testimony of Marce Gonzalez, an experienced appellate public defender. Based on his review of the trial record, appellate briefs, and this Court's opinions, Gonzalez's testimony at the postconviction hearing was "highly critical of [appellate counsel's] work in this case." As we recently noted in *Bieghler v. State,* 690 N.E.2d 188 (Ind.1997), *cert. denied,*— U.S. —, 119 S.Ct. 550, — L.Ed.2d — (1998), appellate ineffective assistance of counsel claims generally fall into three basic categories: (1) denying access to appeal; (2) waiver of issues; (3) failure to present issues well. Harrison's argument in this appeal is based on the second and third of these categories.

The standard of review for a claim of ineffective assistance of appellate counsel is identical to the standard for trial counsel. *Lowery v. State,* 640 N.E.2d 1031, 1048 (Ind. 1994). The postconviction court found that Harrison's appellate counsel met the reasonableness standards of *State v. Van Cleave,* 674 N.E.2d 1293 (Ind.1996), *reh'g granted in part,* 681 N.E.2d 181 (Ind.1997), *cert. denied* — U.S. —, 118 S.Ct. 1060, 140 L.Ed.2d 121 (1998). Moreover, the postconviction court found that the "general, equivocal criticism by Mr. Gonzale[z] is overshadowed by ... appellate counsel['s] vigorous

and partially successful advocacy for Mr. Harrison[.]"

A. *Failure to Present Issues Well*

Harrison argues that his appellate counsel was ineffective for failing to present the following issues well: (1) the statement of facts section; (2) insufficiency of the evidence for the murders of Jordan and Tia; and (3) the existence of mitigating evidence and inappropriateness of the death penalty in his case. As we noted in *Bieghler,* claims of inadequate presentation of issues that were not deemed waived in the direct appeal are the most difficult for defendants to advance and are almost always unsuccessful. 690 N.E.2d at 195. Claims of this type "must overcome the strongest presumption of adequate assistance." *Id.* at 196. As to the third issue, Harrison argues that appellate counsel, in arguing that the death penalty should not have been imposed, "failed to mention even one legitimate mitigating factor in his lead brief to this Court." However, we considered the four mitigating circumstances argued by trial counsel at the sentencing hearing in our second direct appeal opinion. *Harrison v. State,* 659 N.E.2d 480, 482 (Ind. 1995). Indeed, "[w]e commonly review relevant portions of the record, perform separate legal research, and often decide cases based on legal arguments and reasoning not advanced by either party." *Bieghler,* 690 N.E.2d at 195. Harrison has not demonstrated either deficient performance or prejudice as a result of his appellate counsel's failure to present these issues as others might have preferred.

B. *Failure to Present Issues At All*

Harrison also argues that his appellate counsel was ineffective for failing to raise several other issues in his direct appeal. We noted in *Bieghler* that experienced appellate advocates emphasize "the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most a few key issues." *Id.* at 193–94 (quoting *Jones v. Barnes,* 463 U.S. 745, 751–52, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)). Although death penalty briefs are typically lengthy and raise a large number of issues, the length of a brief or number of issues raised is seldom itself indicative of the quality of appellate representation. Harrison's appellate counsel testified at the postconviction hearing that he raised the issues that he considered most meritorious "because if you raise issues that don't stand a chance, it takes away from issues which do." We echoed a similar concern in *Bieghler,* noting that appellate courts "should be particularly sensitive to the need for separating the wheat from the chaff in appellate advocacy, and should not find deficient performance when counsel's choice of some issues over others was reasonable in light of the facts of the case...." *Id.* at 194.

Many of the issues now advanced by Harrison were not preserved for appellate review by a timely objection at trial. The absence of an objection at trial is a proper factor in appellate counsel's decision whether or not to raise an issue. Appellate counsel correctly noted at the postconviction hearing that "if a timely objection is not made, then the issue is waived for appellate purposes." Harrison suggests in this appeal that appellate counsel should have sought to avoid the procedural bar of waiver by raising these issues as fundamental error. However, because none of these issues constituted fundamental error,[21] appellate counsel cannot be said to be deficient for failing to raise these

21. *See generally Barany v. State,* 658 N.E.2d 60, 64 (Ind.1995) (error is "fundamental" if it is so prejudicial to the rights of the defendant that it makes a fair trial impossible). None of the following constitutes fundamental error: (1) alleged use of victim impact evidence during the guilt phase of his trial; (2) the State's alleged violation of a motion in limine and use of allegedly inadmissible hearsay; (3) the trial court's exclusion of testimony regarding other suspects (*see also* Part I, *supra*); (4) the trial court's supposed consideration of irrelevant and inaccurate evidence during the sentencing hearing. In addition, Harrison contends that appellate counsel should have argued that he was denied his right to be present at the penalty phase of his trial. Part III of this opinion addressed that issue on the merits. Similarly, Harrison's contention that appellate counsel was ineffective for failing to challenge trial counsel's decision to proceed with the habitual phase of the trial prior to the penalty phase and for failing to object to the use of an arguably suggestive photo array was resolved in Part II of this opinion.

issues. Moreover, Harrison has not made the necessary showing of prejudice, i.e., he has not demonstrated that this Court would have reversed his convictions or death sentences had these issues been presented.

Harrison contends that appellate counsel was ineffective for failing to challenge the sufficiency of the evidence to support his conviction for arson.[22] In reviewing challenges to the sufficiency of the evidence, we consider only the evidence that supports the verdict and draw all reasonable inferences from that evidence. *Bryant v. State,* 644 N.E.2d 859, 860 (Ind.1994). We do not reweigh the evidence or judge the credibility of witnesses. *Id.* We will uphold a conviction if there is substantial evidence of probative value from which a jury could have found the defendant guilty beyond a reasonable doubt. *Garrett v. State,* 602 N.E.2d 139, 142 (Ind. 1993). There was substantial evidence to support the jury's guilty verdict on the arson count. *See* Part II.A., *supra.* Accordingly, had the issue been raised on direct appeal, Harrison would not have prevailed. Harrison's claim as to this issue fails to satisfy either prong of *Strickland.*

Harrison also argues that appellate counsel was ineffective in briefing after remand and in the petition for rehearing. Harrison contends that appellate counsel should have challenged the trial court's use of his second-degree murder conviction in Virginia as an aggravating factor to support the death penalty because second degree murder lacks the specific intent to kill. *See Smith v. Commonwealth,* 220 Va. 696, 261 S.E.2d 550, 553 (Va.1980). This argument, although not raised in Harrison's second brief, was addressed and rejected in Harrison's second direct appeal. *Compare Harrison,* 659 N.E.2d at 482 ("[t]he record and the law support the findings" of the prior murder aggravator) *with id.* at 484 (DeBruler, J., dissenting) (concluding that Harrison's 1973 conviction "constituted no more than a lesser felony homicide" and therefore did not satisfy the (b)(7) aggravator). Harrison also suggests that appellate counsel should have questioned in his petition for rehearing "whether the amended sentencing order and subsequent reweighing by this Court comported with *Clemons v. Mississippi,* 494 U.S. [738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990).]" Harrison makes no argument in this regard and fails to make any showing that, had this argument been made, we would have ruled differently. The postconviction court's conclusion that there was no proof that appellate counsel rendered ineffective assistance is supported by the record.

### V. Alleged State Misconduct

Harrison contends that the State's conduct at trial "evinced a deliberate attempt to prejudice [him] and violate his rights ..." under the federal and state constitutions. In particular, Harrison draws our attention to (1) the State's violation of the court's ruling on his motion in limine; (2) the use of an allegedly tainted photo array; and (3) the failure to notify defense counsel of Sheila Stewart's application for reward money and a detective's recommendation that she receive it. The State correctly points out that any misconduct as to the first two of these issues has been doubly waived. First, these issues were waived because Harrison made no objection to the alleged misconduct at trial. *Stevens v. State,* 691 N.E.2d 412, 420 (Ind. 1997), *cert. denied,* — U.S. —, 119 S.Ct. 550, 142 L.Ed.2d 457 (1998). Second, the issues were available but not raised on direct appeal so they may not be raised in a postconviction proceeding. *Weatherford v. State,* 619 N.E.2d 915, 917 (Ind.1993). Although Harrison concedes that no objection was made at trial, he suggests that the alleged misconduct amounts to fundamental error. This lofty standard discussed in footnote 21 *supra* is not met by the first or the second of these allegations.

The third issue raised by Harrison presents a somewhat different issue. The alleged failure of the State to disclose evidence relating to Sheila Stewart's request for reward

22. Appellate counsel was questioned about this issue at the postconviction hearing. "I considered raising the insufficiency of evidence, but in my review of the transcript, while one can always, of course, disagree with the evidence, but without reweighing evidence, [I] don't see how you could possibly argue there was insufficiency of evidence."

money is, by its very nature, not a matter that could have been preserved by an objection at trial. Evidence admitted at the postconviction hearing shows that Stewart contacted the arson hotline, an arm of the Indiana State Fire Marshal's office, several months prior to trial.[23] The prosecutor testified at postconviction that she did not know about Stewart's application for a reward until after trial when Detective Gilbert informed her that the Fire Marshal's office had contacted him to request that he or the prosecutor supply a written statement of the significance of Stewart's testimony at trial. After the trial, but approximately two weeks before the sentencing hearing, Gilbert wrote a letter to the Fire Marshal, which concluded "without Sheila Stewart[']s testimony, the case could've been in jeopardy." Harrison contends that the defense could have used Stewart's application or Gilbert's recommendation for reward money at sentencing to strengthen its residual doubt argument. Apparently the argument is that knowledge of Stewart's request for a reward would have affected her credibility, and thereby undermined either the trial court's confidence in the jury verdict, or the jury's guilty verdicts or recommendation of the death penalty.

To support a claim of State misconduct, the withheld evidence must be "material" to Harrison's defense. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Harrison must show "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley,* 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (footnote omitted). Neither the application for a reward by Stewart nor the recommendation by the detective is sufficiently probative of anything to satisfy the materiality standard of *Bagley.*[24] At most they support a talking point to attack the motives of one witness. Failure to identify this possibility and disclose it did not constitute misconduct that undermines the integrity of the trial.

## VI. Denial of Full and Fair Postconviction Hearing

As a final point, Harrison argues that he was denied a full and fair postconviction relief hearing. He contends that (1) Judge Redwine, who presided over Harrison's trial and sentenced him to death, should have recused himself from the postconviction proceeding; and (2) the State obstructed a full and fair postconviction hearing by its delay in forwarding letters to the DNA laboratories authorizing them to release certain materials to his expert for an independent review.

### A. *Denial of Change of Judge*

Harrison filed a motion for change of judge in his postconviction hearing and submitted an affidavit in support of that motion in which he alleged that the trial court was biased and prejudiced against him. The trial court denied his motion,[25] and this Court

23. The form, which is dated April 29, 1991, suggests that this information was conveyed to Chief Rose of the Mount Vernon Police Department who "had several tips" and would "check with the [Prosecutor and] call back." Although Rose testified at the postconviction hearing, he was not asked about his knowledge of Stewart's reward application or whether he discussed it with the prosecutor. If Rose knew of the application, however, this knowledge is imputed to the prosecutor. *See Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ("the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"). Harrison makes no mention of Chief Rose's knowledge in this regard. Assuming that Rose was informed of the Stewart's application, however, Harrison's claim of state misconduct does not entitle him to relief because, as discussed below, it was not "material" evidence.

24. Harrison also mentions this issue in support of his claim of ineffective assistance of trial counsel. He does not, however, allege that his trial attorneys were deficient for failing to discover this evidence. Nor do we conclude that they were.

25. Harrison contends that the postconviction court applied the wrong legal standard in denying this motion. In response to defense counsel's request for an explanation of the basis for denying the motion, the court stated "I don't know that any explanation is required, I just felt that there is no prejudice shown. I guarantee

declined to entertain an interlocutory appeal of the issue. The procedure for change of judge in a postconviction proceedings is governed by Indiana Post-Conviction Rule 1(4)(b), which "requires the judge to examine the affidavit, treat the historical facts recited in the affidavit as true, and determine whether these facts support a rational inference of bias or prejudice." *State ex rel. Whitehead v. Madison County Circuit Court,* 626 N.E.2d 802, 803 (Ind.1993). The language of the rule explicitly states that a request for change of judge is appropriately sought only when a judge has a "*personal* bias or prejudice against the petitioner." Ind. Post-Conviction Rule 1(4)(b) (emphasis added).

Harrison contends that the facts set forth in his affidavit support a rational inference of bias or prejudice. Most of the facts alleged focus on the trial court's scheduling of Harrison's case (giving the State the option to try Harrison or Paul first and switching trial dates at the State's request) and some unfavorable rulings during the pendency of his case (placing limitations on the Baltimore investigator and resisting the pre-trial change of judge motion). In addition, he argues that the trial court's anger at trial counsel and refusal to pay counsel for certain costs associated with the litigation of their pretrial motion for a change of judge "rendered [the trial court] unable to fairly assess their PCR testimony." He also asserts that the trial court had never before denied such a change of judge motion for a postconviction proceeding, including Jeffrey Paul's "skeletal" motion for change of judge.

In *Whitehead,* we noted that the "structure and substance" of the postconviction change of judge rule is similar to the methods used in federal courts, and that federal case law is helpful on the issue. 626 N.E.2d at 803. A trial court's adverse rulings on judicial matters do not indicate a personal bias toward a defendant that calls into question the trial court's impartiality. *See, e.g., United States v. Colon,* 961 F.2d 41, 44 (2d Cir.1992). The only fact alleged to support the allegation of anger at Harrison's trial counsel is the trial court refusal to compensate the attorneys for the litigation of the pre-trial (1991) motion for change of judge. Judge Redwine's refusal to pay trial counsel for litigating an action that he believed was not well-founded, a decision that has at least inferential support in this Court's affirmance of the denial of the pretrial change of judge motion on direct appeal, does not evince the type of anger to warrant an inference of bias or prejudice. *See, e.g., Liteky v. United States,* 510 U.S. 540, 555–56, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) (expressions of impatience, dissatisfaction, annoyance, and even anger do not establish bias or partiality). Moreover, alleged anger at Harrison's trial counsel does not support an inference of personal bias against Harrison, who had no part in the selection of his counsel and presumably little input into their decision to litigate a motion for a change of judge. Finally, whether Judge Redwine had a record of granting the same motion, even in "skeletal" form, in other cases does not support a rational inference that he harbored a personal bias or prejudice against Harrison. The issue before us is simply whether the postconviction court erred in denying Harrison's motion for change of judge, not whether it erred in granting the same motion from other defendants. Because the grounds alleged in Harrison's affidavit do not support a rational inference of personal bias or prejudice against Harrison, the postconviction court did not err by denying the motion for change of judge.

B. *Alleged State Obstruction*

As a final point, Harrison argues that he was denied a full and fair postconviction hearing because the State prevented him from adequately challenging the DNA analysis of semen found in Stacy's mouth that was admitted at trial. One laboratory, using a testing procedure known as restriction fragment length polymorphism (RFLP), was unable to identify any male DNA from the samples. *Harrison v. State,* 644 N.E.2d

you I am not prejudiced against Mr. Harrison. He will get a fair hearing. I have no animosity towards him whatsoever." Although we agree with Harrison that the trial court's explanation suggests the application of an actual prejudice standard, we apply the proper standard in this opinion and reach the same result.

1243, 1250 (Ind.1995). A second laboratory, using a different testing technique—polymerase chain reaction or PCR—was successful in extracting male DNA and concluded that the test excluded 92.6% of all white males as the source of the semen found in Stacy's mouth. *Id.* at 1250–51. Harrison was not excluded.

The postconviction hearing was held on March 3–6, 1997. Several months before the hearing, Harrison's postconviction counsel contacted both labs to obtain the materials and notes produced during their DNA testing of the evidence in this case. However, neither lab would release the information without the approval of the State. Harrison drafted a letter for this purpose, but the State refused to sign it. On December 31, 1996, Harrison filed a Motion for Discovery of DNA Evidence, requesting "autorads of the RFLP testing, color photographs of the PCR test strips, PCR yield gels, slot blot membranes and PCR gels, and notes taken by examiners and lab reports." His motion stated that these materials were needed "to adequately investigate and prepare issues relating to the State's DNA testing." The State initially resisted this motion but five weeks before the postconviction hearing agreed to forward the letters to the labs. Harrison's expert did not receive the materials until February 28, 1997 and March 3, 1997, respectively one business day before the hearing and the day the hearing began.

The State contends that any delay was irrelevant because Harrison was ultimately acquitted of Stacy's murder. We do not agree. DNA evidence was also relevant to the charges of arson and the other murders because, if credited, it placed Harrison—or someone in the 7.4% of the remaining population with a similar DNA profile—at the scene of the crime. Moreover, the evidence was discussed and arguably relied upon by the trial court in arriving at its sentencing decision.

Despite the delays, Harrison offered an affidavit from an expert at his postconviction hearing. The affidavit discussed the newness of the PCR technique and the difficulty most defense attorneys have effectively cross-examining a DNA expert due to the attorneys' limited knowledge of the subject. The affidavit concedes "the reliability of the science of DNA typing," but suggests that "[e]rrors can occur in the manner the testing procedures are performed and in the interpretation of the results." The State objected to the admissibility of the affidavit, and the trial court sustained the objection, noting that the affidavit "has made several legal conclusions, ... [was] not based upon personal knowledge and observation in many aspects, ... [did] not meet the requirements of the law of Indiana as to the admissibility of affidavits, and ... [did not] appear ... that most of this affidavit is relevant or probative or helpful to the Court in any way[.]" Harrison then requested the opportunity to "cure" the affidavit and submit it at a later time, but the trial court denied this request.[26]

Harrison does not contend in this appeal that the affidavit submitted should have been admitted. Harrison argues instead that the postconviction court should have permitted him to file a supplemental affidavit after his expert had an opportunity to review the materials from the laboratories. No proposed supplemental affidavit was submitted to the postconviction court or otherwise included in the record. Although we have no way of knowing precisely what a supplemental affidavit would state, we do know the contents of the affidavit offered in the postconviction court and the materials given to the expert for his review. According to the affidavit held inadmissible, Harrison's expert sought to point out that the performance of DNA tests and the "interpretation of the results in a particular case may be questioned." Harrison does not claim that his expert's analysis would exculpate him or that the DNA evidence wrongfully implicated him. Rather, the expert focuses on the proper weight that should be given to the testimony.

Both the State's delay in authorizing the release of these materials and the post-

26. In the words of the postconviction court, "[t]his has got to come to a close sometime. So if either side doesn't get the information in the record today, I am not going to open the record again—at least this Court is not. I assume some other court might, but this Court is not going to open the record."

conviction court's denial of the opportunity for Harrison to supplement the affidavit are highly problematic. To the extent scientific evidence could potentially exculpate a defendant faced with the death penalty, no amount of inconvenience should bar access to the requested information. This is particularly true in the case of DNA evidence in the 1990s where the time span between technological advances seems to the layperson to be measured in nanoseconds. Unlike many death penalty cases, identity of the perpetrator was a seriously contested issue at trial. Nevertheless, Harrison does not suggest that further DNA analysis may exculpate him. Rather he offers only general statements to the effect that interpretations may vary and many attorneys are unfamiliar with the subject. Based on the record before us, we conclude that Harrison has not shown any prejudicial effect from the State's recalcitrance or the trial court's refusal to allow him to submit a supplemental affidavit.

### Conclusion

The denial of postconviction relief is affirmed.

SHEPARD, C.J., and DICKSON, SULLIVAN and SELBY, JJ., concur.