## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 20 2020, 11:01 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Lisa M. Johnson
Brownsburg, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Anthony A. Parish, <br> *Appellant-Defendant*, <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff*. | April 20, 2020 <br><br> Court of Appeals Case No. 19A-PC-2645 <br><br> Appeal from the Allen Superior Court <br><br> The Honorable Frances C. Gull, Judge <br><br> Trial Court Cause No. 02D04-1403-PC-31 |

**Brown, Judge.**

[1] Anthony A. Parish appeals the denial of his petition for post-conviction relief. We affirm.

## Facts and Procedural History

[2] The relevant facts as discussed in Parish's direct appeal follow:

> Just after 11:00 p.m. on August 6, 2008, Dennis Salley left his home in Fort Wayne to find something to eat. As Salley walked toward his restaurant of choice, he decided to stop by his friend Lance's home at the intersection of Suttenfield and Caroline Streets. As Salley approached the home, he noticed two groups of young males standing in the vicinity. Salley asked them whether Lance was there and was told he was not. As Salley walked past another group of males, one male asked him, "What do you need, old school?" Tr. p. 128. Salley stated, "I'm straight." Tr. p. 128. A member of the group then stated, "Well, get your punk a* * off the block then." Tr. p. 128. Salley turned to face the person he believed had said this and responded, "I ain't no punk." Tr. p. 128. An argument ensued between Salley and this person, who Salley later identified as Parish. Parish shot Salley in the chest, stomach, and side. Salley turned to run away, but Parish pursued him and shot him in the leg and calf. Salley stumbled but was able to run another half block to someone's house for help. Salley was subsequently transported to Parkview Hospital where he was treated for gunshot wounds to the stomach, back, thigh, and calf. As a result of his gunshot wounds, Salley lost his right kidney, suffered a severed liver, and sustained damage to his right leg.
>
> Over a span of approximately two and one-half months, authorities showed Salley a series of photographic arrays. Salley identified several individuals pictured in the arrays as persons present at the time of the shooting but did not identify these persons to be the shooter. On November 3, 2008, Salley

identified Parish, who was pictured in a photographic array, as his shooter.

Authorities investigating the scene found four shell casings in the vicinity. Subsequent testing demonstrated that the casings were a "40 Smith and Wesson" caliber and had been fired from a semiautomatic weapon rather than from a revolver. Tr. p. 257. Witness Rico Parrish [("Rico")][1] claimed to have seen Parish in possession of a "glock type weapon," specifically not a revolver, on the day in question. Tr. p. 195.

*Parish v. State*, No. 02A04-0912-CR-739, slip op. at 2-3 (Ind. Ct. App. March 24, 2010).

[3] On March 11, 2009, the State charged Parish with Count I, attempted murder; Count II, aggravated battery as a class B felony; Count III, carrying a handgun without a license as a class C felony; and Count IV, pointing a firearm as a class D felony. *Id.* at 3.

[4] On July 14 and 15, 2009, the court held a jury trial. *Id.* The jury found Parish guilty as charged, and the court entered a judgment of conviction on each count. *Id.* at 4. At an August 7, 2009 sentencing hearing, the court vacated Parish's conviction in Count II and sentenced him to concurrent sentences of fifty years in the Department of Correction for Count I, eight years for Count III, and three years for Count IV. *Id.* On direct appeal, Parish challenged his attempted murder conviction by claiming that the trial court improperly

---

[1] The court noted Parish and Rico were not related. *See Parish*, slip op. at 3 n.4.

instructed the jury and that there was insufficient evidence to support his conviction. *Id.* at 2. This Court affirmed. *Id.*

In March 2011, Parish filed a petition for post-conviction relief and withdrew the petition in 2014. Parish filed a petition for post-conviction relief on February 27, 2014, and amended petitions on April 11, 2018, June 12, 2018, and January 3, 2019.

On February 15, 2019, the court held a hearing. Parish's trial counsel testified and described his general preparation for a trial in a major felony case to include collecting and reviewing discovery, meeting with the client, reviewing discovery with the client, obtaining a view of where the client wants to go with the case, and deposing witnesses. He testified that he represented Parish in two cases, the case involving the attempted murder of Salley and a murder case.

The court admitted a letter from Parish's trial counsel to Parish dated June 22, 2009, which stated:

> Today, I was scheduled to take a number of depositions on the Attempt Murder case. Mr. Salley, the alleged victim, has moved from Fort Wayne and his deposition is to be rescheduled as a result of his not getting back here in time for the deposition today. Two of the other people on the State's Witness List, Arrington and Lee, are now in prison. While they can be brought back to be deposed, the State now tells me they do not intend on calling them as witnesses. Unless you have some interest in them, I would not be inclined to depose them.

Exhibits Volume I at 9.

[8] When asked about Rico, Parish's trial counsel stated that Rico had significant involvement in the cases and was a friend of Parish, a witness against Parish in the attempted murder case, and a witness in the murder case. When asked if he recalled if he had considered looking for evidence to impeach Rico, he stated he deposed Rico but did not recall "seeking out folks or having folks approach me with opinions about his character for honesty or attacking him in that way." Post-Conviction Transcript Volume II at 7. He testified that it was his normal practice to read everything the State provided in discovery and he did not recall any prior inconsistent statements from Rico in the murder case. When asked if he recalled Rico being charged with aggravated battery and criminal recklessness in October of 2008, he answered: "Not specifically, but I – my general recollection of [Rico] is that he, over the years, has had numerous run-ins with the legal system where he's been a defendant. That wouldn't surprise me to learn." *Id.* at 8. He indicated that he did not remember the charges being dismissed three days after they were filed and that he did not recall the name Robert Lee. When asked why he did not depose Lee, he answered: "Well, just inferring from [the June 22, 2009] letter, if that's how I left it in the letter, if [Parish] didn't suggest to follow up with that then that's probably why, because I suggest in the letter I wasn't inclined to pursue them." *Id.* at 12. He testified that he did not consider consulting with or presenting testimony from an eyewitness identification expert.

[9] The court admitted an affidavit of Lee dated June 2018 which asserted that he and Parish were talking to a woman named Nia and another woman when

Salley approached, Parish "was out there when Salley got shot, but [he] did not shoot Salley," Salley was not close to Parish when he was shot, the police questioned Rico, and Rico later told him in a conversation in 2011 that "he had to 'throw Anthony Parish under the bus' to get himself out of some problems he was having with the police." Exhibits Volume V at 132-133. He also stated Rico was his distant cousin, was "one of the most dishonest people" he had ever known, and had a reputation for "getting arrested and then falsely incriminating somebody else in order to get himself out of trouble." *Id.* at 133.

[10] The court admitted an affidavit of Rico in which he asserted his testimony was "not entirely truthful," and he "was coerced, threatened, and manipulated by the police to testify to a version of events which they found acceptable." Exhibits Volume VI at 3. He also asserted that he was arrested for aggravated battery, battery, and criminal recklessness on October 14, 2008, Detective Chad Wagner and Officer Christopher Hoffman questioned him, Detective Wagner told him the charges against him would be dismissed if he agreed to testify against Parish, and he agreed to accept the offer. He also stated that Detective Lorna Russell later told him that the charges would be refiled if he "did not tell her what she wanted to hear." *Id.* at 4. With respect to the August 6, 2008 offense, Rico asserted:

> 9. On August 6, 2008, I was with [Parish], from around 9:00 a.m. or 10:00 until around 11:00 a.m. or 12:00 p.m. We were in a large, white, car with Gabrielle. Gabrielle's last name is Carswell. Gabrielle's mother's last name is Holley. When I testified that his name was Gabrielle Holley, I must have been

thinking of his mother.  Gabrielle was driving, [Parish] was sitting in the front passenger seat, and I was in the back seat.

10.  There was a gun sitting on the center console of Gabrielle's car, in the front seat.  I do not know who the gun belonged to.  I did not see Gabrielle or [Parish] touch the gun.  I did not hear Gabrielle or [Parish] claim ownership of the gun.  I do know that Gabrielle had a license to carry a handgun at the time.

*Id.* at 4.  The court admitted affidavits of Detectives Wagner and Russell denying the assertions in Rico's affidavit.

[11]  The court admitted affidavits from multiple individuals indicating that Rico had a reputation for being dishonest and making false accusations.  Parish introduced and the court admitted a report from Deryn Strange, a professor of psychology, discussing how memory works and the general problem of mistaken identifications and highlighting research findings relating to certain factors.  On November 5, 2019, the court denied Parish's petition in a thirty-page order.

## Discussion

[12]  The petitioner in a post-conviction proceeding bears the burden of establishing grounds for relief by a preponderance of the evidence.  *Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004); Ind. Post-Conviction Rule 1(5).  When appealing from the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment.  *Fisher*, 810 N.E.2d at 679.  On review, we will not reverse the judgment unless the evidence as a whole unerringly and unmistakably leads to a conclusion opposite that reached by the

post-conviction court. *Id.* "A post-conviction court's findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made." *Id.* In this review, we accept findings of fact unless clearly erroneous, but we accord no deference to conclusions of law. *Id.* The post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses. *Id.*

[13] Parish argues his trial counsel was ineffective for failing to: (A) interview, depose, or present the testimony of Lee; (B) present reputation and opinion evidence showing Rico was not credible; (C) present expert testimony regarding the inherent unreliability of eyewitness identifications; and (D) present evidence regarding the favorable treatment Rico received from the State in an unrelated case.

[14] To prevail on a claim of ineffective assistance of counsel a petitioner must demonstrate both that his counsel's performance was deficient and that the petitioner was prejudiced by the deficient performance. *French v. State*, 778 N.E.2d 816, 824 (Ind. 2002) (citing *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), *reh'g denied*). A counsel's performance is deficient if it falls below an objective standard of reasonableness based on prevailing professional norms. *Id.* To meet the appropriate test for prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Perez v. State*, 748 N.E.2d 853, 854 (Ind. 2001). Failure to satisfy either prong

will cause the claim to fail. *French*, 778 N.E.2d at 824. Most ineffective assistance of counsel claims can be resolved by a prejudice inquiry alone. *Id.*

[15] When considering a claim of ineffective assistance of counsel, a "strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Morgan v. State*, 755 N.E.2d 1070, 1072 (Ind. 2001). "[C]ounsel's performance is presumed effective, and a defendant must offer strong and convincing evidence to overcome this presumption." *Williams v. State*, 771 N.E.2d 70, 73 (Ind. 2002). Evidence of isolated poor strategy, inexperience, or bad tactics will not support a claim of ineffective assistance of counsel. *Clark v. State*, 668 N.E.2d 1206, 1211 (Ind. 1996), *reh'g denied*, *cert. denied*, 520 U.S. 1171, 117 S. Ct. 1438 (1997). "Reasonable strategy is not subject to judicial second guesses." *Burr v. State*, 492 N.E.2d 306, 309 (Ind. 1986). We "will not lightly speculate as to what may or may not have been an advantageous trial strategy as counsel should be given deference in choosing a trial strategy which, at the time and under the circumstances, seems best." *Whitener v. State*, 696 N.E.2d 40, 42 (Ind. 1998).

A. *Lee*

[16] Generally, deciding which witnesses to call is the "epitome of a strategic decision," *Wrinkles v. State*, 749 N.E.2d 1179, 1200 (Ind. 2001), *cert. denied*, 535 U.S. 1019, 122 S. Ct. 1610 (2002), and such decisions are insufficient to

establish ineffective representation.  *See Kelly v. State*, 452 N.E.2d 907, 910 (Ind. 1983).  The Indiana Supreme Court has held:

> With the benefit of hindsight, a defendant can always point to some rock left unturned to argue counsel should have investigated further.  The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that it deprived the defendant of a fair trial.  *Strickland*, 466 U.S. at 686, 104 S. Ct. 2052.  *Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing.  *Wiggins v. Smith*, 539 U.S. 510, 533, 123 S. Ct. 2527, 156 L.Ed.2d 471 (2003).  This would interfere with the constitutionally protected independence of counsel at the heart of *Strickland*.  *Id.*  Rather, we review a particular decision not to investigate by looking at whether counsel's action was reasonable in light of all the circumstances.  *Id.* at 521-22, 123 S. Ct. 2527.  In other words, counsel has a duty to make a reasonable investigation or to make a reasonable decision that the particular investigation is unnecessary.  *Id.* at 521, 123 S. Ct. 2527.

*Ritchie v. State*, 875 N.E.2d 706, 719-720 (Ind. 2007), *reh'g denied*.

[17]  In this case, the post-conviction court's order states:

> 7.  Detective Craig Gregory of the Fort Wayne Police testified at trial that he attempted to interview witness Robert Lee, but "[h]e wouldn't talk to us."  This testimony was consistent with Detective Gregory's statement on page 6 of a police report dated August 8, 2008, admitted as Petitioner's Exhibit 26 at the post-conviction hearing: "I first went in to interview ROBERT DESEAN LEE.  MR. LEE immediately advised that he wanted an attorney.  I advised MR. LEE that he was only a witness at this point.  MR. LEE stated that he was not speaking to anyone

without an attorney present." [Trial counsel] did not subsequently try to interview witness Lee or to present his testimony at trial. At the post-conviction hearing, [trial counsel] did not remember anything about Lee.

* * * * *

13. . . . . On the supposition that [trial counsel] should have tried to interview Robert Lee notwithstanding Lee's refusal to talk to police, Petitioner has not shown a reasonable probability that the outcome of his trial would have been affected, for the following reasons.

14. First, Lee's affidavit does not even state that he would have talked to [trial counsel] (unlike the police) *before trial* if asked, but only that he would have made certain statements *at trial*. To form a reasonable professional judgment that Lee should be called to testify for the defense at trial, [trial counsel] would have needed at least some reason to believe, before trial, that Lee's testimony would be available, credible, and favorable to the defense. Lee's affidavit gives no indication of any way in which [trial counsel] could have made any of those determinations, much less all of them, before trial. From the fact that Lee had refused to talk to the police, although it cannot be definitely inferred that Lee would also have refused to talk to [trial counsel], it also cannot be definitely inferred that Lee would have *agreed* to talk to [Parish's trial counsel], and no evidence establishes that he would have agreed to do so. For this reason, Lee's affidavit has no tendency to establish that the outcome at trial would have been affected by Lee's statements, for those statements would not have been presented at trial if [trial counsel] had not been able to evaluate them before trial.

15. Even on the questionable supposition that Lee really meant to say he would have talked to [trial counsel] before trial and testified at trial, serious difficulties remain with Petitioner's claim that testimony from Lee would have affected the outcome of the trial. By submitting Lee's account only in the form of an

affidavit, Petitioner has failed to give the Court an opportunity to observe the effect that cross-examination would likely have had on Lee's testimony if presented at trial. Among the questions that could have been asked on cross-examination, not answered in the affidavit, are these: Did you see who shot Dennis Salley? If so, why didn't you say so? If not, why didn't you say you did not see who shot him? Why did you refuse to talk to the police? Aren't you a friend of Anthony Parish? How close was Anthony Parish to the corner of Caroline and Suttenfield when the shooting took place on Suttenfield? How did you happen to remember that these events took place at around 11:30 p.m.? Did you see who, if anyone, was talking to Dennis Salley at the time when he was shot? Did you see anyone there whom Salley could have mistaken for Anthony Parish? Given your extremely poor opinion of Rico Parrish's character for truthfulness, did you have any reason to believe he was telling the truth when he said he had just gotten up at 11:00 or 12:00? Were you keeping Rico Parrish under constant surveillance from the time you saw him at 11:00 a.m. or 12:00 p.m. until the shooting in the late evening hours? If so, why? If not, how do you know where he was during that entire time? Petitioner has not even shown that Lee could have answered such questions to [trial counsel's] satisfaction if interviewed, so as to give reasonable assurance to [trial counsel] that Lee's testimony would stand up under cross-examination; much less has he shown that Lee's testimony actually would have been found credible under cross-examination at trial.

16. Finally, in view of the very long interval between the events described and the execution of Lee's affidavit, there appears to be a very significant possibility that the affidavit has been affected by certain factors specified by Dr. Strange as affecting memory, specifically the decline of memory over time and the influence of post-event information creating inaccuracies in memory, which is a "reconstructive process prone to error." The most glaring example of post-event information is Lee's assertion that Rico Parrish made an admission to him in 2011, but the influence of

post-event information appears to be discernible in other respects as well. Lee's claimed memory of the events of August 6, 2008, is highly detailed, and includes statements that appear to have been likely formulated after the fact in response to knowledge acquired from the evidence at trial. Notably, Lee's statement that Petitioner "did not swear" at Salley can be best understood as a later-devised response to Salley's testimony at trial that a person later identified as Petitioner had said, "get your punk a** off the block". The question whether Petitioner did swear at Salley would not appear to have arisen if not for this testimony, and Lee states no way in which he could have found out about the "punk a**" language before trial if he did not hear Petitioner using such language. Likewise, Lee's statements that Rico Parrish said he had just gotten up at 11:00 or 12:00, and that Rico Parrish hung around the neighborhood the rest of the day until the time of the shooting, can best be understood as later-devised responses to Rico Parrish's testimony that he observed Petitioner in a car with a gun sometime before 11:30 a.m. or 12:00 noon on the day of the offense, and that he did not see Petitioner again on that day. In view of these fairly obvious later-devised "memories," in turn, serious questions arise as to whether other aspects of Lee's claimed memories, such as that Petitioner was not even close to the place where Salley testified that he confronted him, were also later-devised responses to information derived from testimony at trial. The Court is not convinced that Lee would actually have presented statements such as these in his testimony at trial, if given – much less in an interview with [trial counsel] before trial, in which [trial counsel] would have needed to evaluate the credibility of Lee's possible testimony.

Appellant's Appendix Volume III at 129, 145-148 (citations and footnotes omitted).

[18] The record reveals that Lee asserted in his affidavit dated almost ten years after the incident that he and Parish were talking to two women when Salley

approached. However, the record does not reveal that Parish told his trial counsel he had been engaged in a conversation with Lee at that time or that Lee could support his defense. Trial counsel sent a letter to Parish indicating the State did not intend on calling Lee as a witness, and "[u]nless you have some interest in them, I would not be inclined to depose them." Exhibits Volume I at 9. Trial counsel testified he did not recall Parish ever telling him he wanted Lee to be called as a witness. Under these circumstances, we cannot say that trial counsel's performance was deficient. While Lee asserted in his affidavit that he would have testified at trial, the record does not demonstrate that Lee would have spoken with trial counsel if he had been contacted prior to the trial. Further, at trial, when asked if he testified that Parish shot him, Salley answered: "I'm for sure. Yeah, there's no question in my mind, man." *Id.* at 152. When shown a photo array and asked if he recognized the exhibit, Salley stated: "Yeah. This is the guy who shot me right here. This is this Anthony Parish kid." *Id.* at 161. When asked if he immediately recognized Parish, Salley answered: "Immediately." *Id.* at 162. He indicated that he remembered six photo arrays being shown to him and did not identify the shooter until the sixth photo array. We cannot say the evidence as a whole unerringly and unmistakably leads to a conclusion opposite that reached by the post-conviction court.

B. *Reputation and Opinion Evidence Regarding Rico*

[19]     The post-conviction court's order states:

> 18.  The testimony of Rico Parrish, regarding the gun he observed in the car in which he and Petitioner were riding earlier in the day, would appear to have been admissible to show that Petitioner had access to a weapon of the type used in the shooting.  Nevertheless, the probative value of this evidence of a vaguely described, apparently common type of handgun in a car near Petitioner (not touched or claimed by him), in relation to the issue of whether Petitioner was the one who later shot Dennis Salley, would appear to have been quite slight.  The outcome at trial surely would have been the same even if this testimony had not been presented at all.  *A fortiori*, had Rico Parrish's credibility been impeached by one or more of the means now proposed by Petitioner (i.e., reputation and opinion evidence of poor character for truthfulness, and supposed favorable treatment from the prosecution), there is no probability that the outcome at trial would have been different.

Appellant's Appendix Volume III at 149 (citations omitted).

[20]     On cross-examination, trial counsel testified that he did not recall Parish or anyone approaching him about a possibility of impeaching Rico using opinion or reputation evidence about his character for truthfulness.  Parish acknowledges that "[a]s the post conviction court explicitly found, Rico's testimony had minimal probative value."  Appellant's Brief at 28.  He also asserts that, while Rico testified he saw a gun in a car in which he, Parish, and a third individual were riding, he did not testify that Parish touched the weapon or claimed it belonged to him.  Further, as pointed out by the State, Rico testified on cross-examination that he was sure Parish had his arm in a sling that day, while trial counsel elicited testimony from Salley on cross-

examination that he did not remember anyone wearing a cast or something similar that night and later emphasized this during closing argument. **(Ex. I 181-182, 186-187; Ex. II 54-55)** We cannot say reversal is warranted on this basis.

C. *Expert Testimony Regarding Eyewitness Identifications*

[21] The post-conviction court's order discussed Dr. Strange's report and stated in part:

> For the same reason, statistics regarding percentages of identifications that are confident but mistaken in experimental groups would have had no tendency to establish that Dennis Salley's confident identification of [Parish] as the perpetrator was, or might have been, mistaken. At most, expert testimony could have established the distinct possibility that an eyewitness identification may be confident but mistaken under at least some conditions – exactly the same possibility that [trial counsel] presented at length to the jury in cross-examination and closing argument. [Parish] has not shown that expert testimony about the possibility of a confident but mistaken eyewitness identification would have been any more convincing to the jury than were [trial counsel's] cross-examination and argument.

Appellant's Appendix Volume III at 153-154.

[22] The report of Dr. Strange stated: "I am not commenting on the credibility of any witness nor expressing an opinion about the reliability of any identification in this case." Exhibits Volume V at 230. Further, Ind. Evidence Rule 704(b) provides that "[w]itnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a

witness has testified truthfully; or legal conclusions." While Dr. Strange's report discussed factors that influence the accuracy of identifications such as lighting and distance, stress, time estimation, exposure duration, retention interval, and post-event information, the record reveals trial counsel extensively cross-examined Salley regarding a number of these factors and reiterated the possibility Salley was mistaken in his identification. Specifically, trial counsel questioned Salley about the lighting conditions, and Salley indicated on cross-examination that he was under the effects of medication when he was shown a lot of the photo arrays, he never saw the gun that caused his injuries, he was startled when he was shot, the person could have been a little shorter or a little taller than him, he did not know if there was anything distinctive about the shooter, it happened fast, and he was running for his life. During closing argument, trial counsel argued Salley was mistaken and emphasized his limited opportunity to observe the shooter. We also note that Parish's trial counsel relied upon Rico's testimony at trial. As mentioned above, Rico testified on cross-examination that he was sure Parish had his arm in a sling that day, while trial counsel elicited testimony from Salley on cross-examination that he did not remember anyone wearing a cast or something similar that night and later emphasized this during closing argument. We cannot say the evidence as a whole unerringly and unmistakably leads to a conclusion opposite that reached by the post-conviction court. *See Harrison v. State*, 707 N.E.2d 767, 779 (Ind. 1999) (holding that it was at best wholly speculative that a request for the appointment of an expert witness to testify about eyewitness identifications would have been granted or that the expert testimony would have affected the

outcome of the trial and concluding that trial counsel's failure to request an eyewitness testimony expert did not overcome the strong presumption of counsel's competence), *reh'g denied*, *cert. denied*, 529 U.S. 1088, 120 S. Ct. 1722 (2000).

D.  *Evidence Regarding Favorable Treatment Received by Rico*

[23]     The post-conviction court's order states:

> Aside from the affidavit of Rico Parrish, which the Court finds unworthy of credit, no evidence suggests that Rico Parrish received favorable treatment from the prosecution in any case in exchange for testimony in cause number 02D04-0901-MR-3. Instead of credible evidence, Petitioner presents only unfounded conjecture to the effect that Rico Parrish may have feared he would be charged if he did not give testimony favorable to the prosecution.  The only evidence on this point which the Court finds to be credible, the affidavits of Lorna Russell and Chad Wagner, provides no support for the claim that Rico Parrish feared he would be charged if he did not say what the police or the State wished him to say.

Appellant's Appendix Volume III at 143 (citations omitted).

[24]     The record reveals that the State charged Rico with aggravated battery, battery, and criminal recklessness on October 14, 2008, under cause number 02D04-0810-MC-2350.  That same day, the trial court found probable cause to hold Rico for seventy-two hours.  Three days later on October 17, 2008, the court dismissed the charges against Rico on the State's motion, which was more than four months before Parish was charged in the underlying case.  Rico asserted in

his affidavit that Detective Wagner told him that the charges would be dismissed if he agreed to testify against Parish and that Detective Russell said the charges would be refiled if he did not tell her what she wanted to hear. However, Detective Wagner stated in an affidavit that he interviewed Rico in October 2008 and there was no discussion of the shooting incident occurring on August 6, 2008, and that he did not tell Rico at any time that any charges would be dismissed if he agreed to testify against Parish in regard to any matter nor that any charges would be dismissed only if he told him what he wanted to hear. Further, Detective Russell asserted in her affidavit that she interviewed Rico in October 2008 in connection with the murder investigation that led to the conviction of Parish in cause number 02D04-0901-MR-3 and that she did not discuss any actual or potential charges against Rico and did not say that any charges would be filed or refiled if he did not tell her what she wanted to hear. We cannot say that reversal is warranted.

For the foregoing reasons, we affirm the denial of Parish's petition for post-conviction relief.

Affirmed.

Najam, J., and Kirsch, J., concur.